No. 48,017

BILL O. SUHM, (Claimant) *Appellant*, v. VOLKS HOMES, INC., (Respondent) and FIREMAN'S FUND AMERICAN INSURANCE COMPANIES (Insurance Carrier), *Appellees.*

(549 P. 2d 944)

Opinion filed May 8, 1976.

*Otto J. Koerner* and *Randall H. Elam*, both of Wichita, argued the cause and were on the brief for the appellant.

*Robin L. Wick*, of Turner and Hensley, Chartered, of Wichita, argued the cause, and *William A. Hensley* and *Raymond L. Dahlberg*, of the same firm were with him on the brief for the appelles.

The opinion of the court was delivered by

KAUL, J.: This is an appeal from a district court's denial of a claim under the Workmen's Compensation Act for disability caused

by a myocardial infarction. The claim had previously been denied by the examiner and the director.

The controlling question is whether there is any substantial competent evidence to support the trial court's negative finding that claimant's heart attack was not caused by unusual exertion in his employment within the meaning of K. S. A. 1975 Supp. 44-501—specifically the so-called 1967 "heart amendment" thereto.

Claimant was employed as sales and marketing manager for respondent, Volks Homes, Inc., on October 6, 1971, at a salary of $20,000.00 per year. Immediately prior to his employment by respondent he had worked as a real estate broker and prior thereto he had owned and operated the Yellow Van and Storage Company of Wichita, which had taken bankruptcy. Claimant's work, as he described it, consisted primarily of locating markets for modular homes which were constructed by respondent.

Claimant described his usual workday as commencing about 8:15 a. m. when he left home, picked up the company mail, and went to the office where he performed most of his work at a desk. He answered mail pertaining to sales and marketing and usually spent the rest of the day in informal meetings with company personnel on various aspects of the business. He took a coffee break in the morning and usually had an hour or two for lunch. He usually left the office around 5 p. m., although there were times when he would work until 6 p. m. He testified that his duties consisted mostly of sales work, which had not been going well, and that there was some stress and strain in connection with his work.

Claimant further testified that in the course of his employment he occasionally made trips, and prior to his heart attack had made a trip to Topeka and other trips to Kansas City; Hesston; Cheney Lake; Grove, Oklahoma; and Neosho, Missouri. He testified that one of the reasons for his employment by respondent was that he was familiar with FHA practice and procedures and personally knew some of the HUD officials of FHA in the Topeka office. At the request of Mr. Barrier, President of respondent, claimant drove to Topeka on October 7, 1971, the day after he was hired, and made an appointment with HUD officials of FHA in Topeka for a conference with Mr. Barrier and other executives of respondent. Claimant arranged the appointment for January 26, 1972. The claimant's claim was that his activities in driving to Topeka on January 26, 1972, and the emotional stress he had undergone in connection with the conference with FHA officials precipitated the heart at-

tack, which he suffered after returning to his home in Wichita that evening.

It was claimant's position before the examiner, the director and district court, and now before this court, that his activities on January 26, 1972, amounted to more than his usual work in the course of his regular employment and, thus, took his case out of the so-called 1967 "heart amendment" to K. S. A. 1975 Supp. 44-501.

Claimant testified that on the day in question he left his home about 6:15 a. m., had his automobile serviced, picked up three company officials, and drove to Topeka for a meeting which was scheduled for 10 a. m. He testified that two circumstances in connection with the meeting caused him emotional stress. First, he knew if respondent did not get some type of FHA approval for its modular homes the company would probably not survive; and, second, that the director of FHA in Topeka was a personal acquaintance of claimant's and, thus, claimant was anxious that the meeting be successful.

Following the meeting, which lasted about two hours, claimant and his group had lunch in Topeka and left for Wichita where they arrived about 4:30 p. m. Claimant went by the plant where he was engaged in a sales meeting for about thirty-five minutes. He arrived home around 6:30 p. m., had a highball and went out for dinner with his wife, returning to the home about 8 or 8:30. Claimant put on his night clothes, stepped outside and picked up a log for the fireplace. He sat by the fire for about ten minutes when he began to feel like he was being choked and told his wife to call a doctor. Claimant was taken by ambulance to the hospital where he was examined and his condition diagnosed as myocardial infarction by Dr. James C. Mershon, a cardiologist. Claimant was kept in the intensive care unit for seven days and was then transferred to a regular hospital room where he remained for sixteen days.

Claimant returned to work at his real estate business where he was working about six hours a day when he testified before the examiner on June 8, 1972. He testified that the physical limitations which his doctor imposed were simply to use good judgment and to pace himself.

Dr. Mershon testified that based upon reasonable medical certainty there was a causal relationship between the stress of the particular day, as described to him by claimant and the myo-

cardial infarction suffered that evening. Dr. Mershon further testified:

".  .  . In my opinion, the physical activity, in and of itself, of the type that Mr. Suhm was involved in on the day of the occurrence of his myocardial infarction, based upon the information I have, is, on occasion, causally related to the type of myocardial infarction I diagnosed."

On redirect examination Dr. Mershon was interrogated further by claimant's counsel concerning whether there was a probability that claimant's myocardial infarction was precipitated by the work load, mental stress, and long hours involved on the day in question. When pressed to be more definite as between probability and possibility the doctor testified:

"Q. (By Mr. Koerner) Oh, yes. You use the word 'reasonable.' I am just asking if it is a probability.

"A. I'd rather say it is a possibility.

"Q. And is it also true that considering his history, general physical condition, that it is a possibility—a real possibility—that Mr. Suhm might have had this myocardial infarction even if he hadn't gone to work that day?

"A. It is a possibility. I have answered that before."

As so often occurs in workmen's compensation proceedings, the testimony of Dr. Mershon was disputed by that of Dr. Richard Lawrence Sifford, who was called as a witness for respondent. Dr. Sifford is "Board Certified" in internal medicine and practices the sub-specialty of cardiology; he testified in pertinent part:

"In my opinion, there is no relationship whatsoever between anything that happened to Mr. Suhm and his subsequent myocardial infarction. In my opinion, physical exertion has no relationship whatsoever to myocardial infarction no matter how unusual. In my opinion, there has been no medical evidence of sufficient import to establish that there is a causal relationship between physical exertion and myocardial infarction.

"In my opinion, it is improper for any physician to say that emotional stress has anything to do with myocardial infarction, and, in my opinion, it is improper for any physician to say that it does not since it is a controversial subject. There is a study which states that emotional stress does have a relationship, but there are problems with this study, one of them being that the study involves people who have a life style long-term stress. Since it is controversial I am not going to say that life style long-term emotional stress does not have a relationship to myocardial infarction.

"In my opinion, there is evidence which indicates that a terrible emotional experience could cause a myocardial infarction right at the time. Even though I have stated that, in my opinion, it is very rare to have an emotional incident, I admit that there is definite evidence to indicate that this can happen. I know of no study that ever tried to relate an emotional incident with an attack which occurred 8 hours later.

. . . . . . . . . . . . .
"I cannot say within a reasonable medical certainty what caused Mr. Suhm's myocardial infarction at 8:30 that evening."

The trial court found in pertinent part:

"The Court has read the transcripts of the evidence from the Workmen's Compensation Commissioner [Director] and the medical testimony several times. The Court in general finds the same as did the Workman's Compensation Commissioner [Director] with the exception the Court in its findings didn't intend to include the obvious error set out in Finding I of the Commissioner [Director].

"The Court specifically finds that the medical testimony of the doctors did not connect the injury with the work. Dr. Sifford could find no connection whatsoever and the most that Dr. James C. Mershon could find was that there was a possibility. He specifically refused to state there was any connection to a reasonable medical probability. Consequently, the Court finds after considering all of the evidence that the heart condition was not caused by the Complainant's work with his employer."

Claimant specifies several points of error on appeal. He first contends the trial court erred in finding there was not a preponderance of evidence to establish that claimant suffered a heart attack from unusual exertion in his employment within the meaning of 44-501.

In 1967 the legislature amended 44-501 by enacting the heart amendment which reads:

". . . Compensation shall not be paid in case of coronary or coronary artery disease or cerebrovascular injury unless it is shown that the exertion of the work necessary to precipitate the disability was more than the workman's usual work in the course of the workman's regular employment."

Since its enactment the amendment has been examined by this court in a series of cases. In the first three cases (*Osman v. City of Wichita,* 203 Kan. 313, 454 P. 2d 427; *Lyon v. Wilson,* 201 Kan. 768, 443 P. 2d 314; and *Pratt v. Seis-Tech Exploration Co.,* 199 Kan. 732, 433 P. 2d 555), contentions by respective respondents, that the provisions of the amendment should be applied retrospectively, were rejected. Subsequent cases in which the amendment has been examined are: *Dial v. C. V. Dome Co.,* 213 Kan. 262, 515 P. 2d 1046; *Simpson v. Logan-Moore Lumber Co.,* 212 Kan. 404, 510 P. 2d 1234; *Nichols v. State Highway Commission,* 211 Kan. 919, 508 P. 2d 856; *Dolan v. Steele,* 207 Kan. 640, 485 P. 2d 1318; *Calvert v. Darby Corporation,* 207 Kan. 198, 483 P. 2d 491; and *Muntzert v. A. B. C. Drug Co.,* 206 Kan. 331, 478 P. 2d 198. An examination of the cases reveals that several salient principles concerning the import and application of the amendment have been firmly established and consistently adhered to. (1) The legislative intent in enacting the

amendment was to limit and restrict the application of 44-501 insofar as heart cases were concerned. (2) The heart cases to which the amendment applies are those where the exertion of the claimant's work is the agency which necessarily precipitates the disability. (3) What is usual exertion, usual work and regular employment as those terms are used in the amendment will generally depend on a number of surrounding facts and circumstances—among which the daily activities of the workman may be one, but only one among many factors. (4) Where an external force, rather than exertion, is the agency which produces the workman's disability, the usual versus unusual exertion test contemplated by the amendment is irrelevant. (5) Whether the exertion of the work necessary to precipitate a disability was more than the workman's usual work in the course of his regular employment presents a question of fact to be determined by the trial court.

The main thrust of claimant's argument in support of his first contention is that his work and emotional stress on the day in question was more than his usual work in the course of his regular employment, and, thus, his claim is not controlled by the heart amendment. Essentially, the same argument was advanced in *Nichols v. State Highway Commission*, supra, wherein we said:

"Whether the exertion of the work necessary to precipitate the disability was more than the workman's usual work in the course of his regular employment presents a question of fact which must be determined by the trial court. As was so aptly said in *Calvert v. Darby Corporation*, supra, 'the issue before this court is simply whether the findings of the district court . . . and its judgment are supported by substantial competent evidence.' . . .'" (pp. 925, 926.)

In *Nichols* we examined the evidence relating to usual versus unusual exertion and decided the case by applying the customary "substantial evidence" criterion for appellate review of trial court findings of fact. This same type of review has been afforded in our other cases dealing with the amendment. (See *Dial v. C. V. Dome Co.*, supra, and cases cited therein.)

In the instant case the trial court found that the medical testimony did not connect the injury with the work. In other words, the question whether claimant's exertion was more than his usual work within the meaning of the amendment was irrelevant. Nevertheless, it appears the trial court also found that claimant failed to establish that his exertion on the day in question was more than his usual work. Either conclusion forecloses claimant's claim and apply-

ing the traditional test on appellate review, we believe the record reflects sufficient evidence to support both conclusions of the trial court.

Concerning causal connection, claimant's medical testimony in summation, put exertion as a causal possibility. While respondent's medical witness would not deny that on occasion exertion could cause a heart attack, he was positive in testifying that there was no causal relation between claimant's physical activities or emotional stress and the myocardial infarction suffered on the night of the day in question. Dr. Sifford admitted that emotional stress, as causation, was a controversial subject, but in support of his positive testimony in the instant case he discussed treatises written and experiments conducted by medical experts working with the subject. We find that the testimony of Dr. Sifford sufficiently supports the trial court's conclusion on causal connection.

While claimant testified in great detail concerning his physical activities on the day in question and emphasized the emotional stress he was under at the FHA meeting, he admitted that he had put in other long days, coupled with various trips of considerable distance. He admitted on cross-examination that: "No one got angry at the meeting that took place in Topeka on January 26, 1972. Nobody threatened anyone or got upset." He admitted that he had been subjected to financial pressures before in connection with the bankruptcy of his Yellow Van and Storage Company. He also conceded on cross-examination that there was some stress in his daily work with respondent. He testified: "I don't mean to say that this job was any bed of roses. No job is. There's daily stresses."

Claimant relies upon exceptional stress in attempting to overcome the barrier imposed by the heart amendment. He proposes the case of *Dial v. C. V. Dome Co.*, supra, in support of his argument that emotional stress is an external force which takes a claim out from under the amendment barrier. In *Dial* we affirmed a trial court's ruling that environmental heat was the external force or agency which produced the claimant's disability, rather than the exertion of his work. The distinction between the instant case and *Dial* is clearly demonstrated by this excerpt from the opinion:

". . . The medical testimony is clear that it was *heat* that produced the disability; no mention is made in the testimony of *exertion* as a causative factor. . . ." (p. 266.)

In the case at bar, it cannot be said there was clear medical testimony that emotional stress was the external force or agency which

precipitated claimant's heart attack. In fact, the testimony of Dr. Sifford fully supports the trial court's negative finding on this point.

Claimant contends the trial court erred in considering only the medical testimony and ignoring lay testimony in making its determination whether claimant's injury was causally related to his work. The contention is refuted by the trial court's statement:

"Consequently, the Court finds after considering *all of the evidence* that the heart condition was not caused by the Complainant's work with his employer." (Emphasis supplied.)

The lay testimony which was exclusively that of claimant was by no means all favorable to claimant on the issue of causation. His testimony was that his heart attack occurred more than eight hours after the Topeka meeting and more than two hours after he had left work, following consumption of alcoholic beverages, eating his dinner, and carrying in firewood.

We have examined all of the arguments presented by claimant and find no reason shown to disturb the findings of the trial court which were supported by substantial competent evidence.

The judgment is affirmed.