No. 89,091

WAYNE MUDD, ERICA MUDD, and CONNOR MUDD, Surviving Spouse and Dependent Children of DEBRA SUE MUDD, Deceased, *Claimants/Appellees,* v. NEOSHO MEMORIAL REGIONAL MEDICAL CENTER, *Respondent/Appellant,* and KANSAS HOSPITAL ASSOCIATION WORKERS COMPENSATION FUND, INC., *Insurance Carrier/Appellant.*

62 P.3d 236

188

Opinion filed January 24, 2003.

*Nancy S. Anstaett*, of Rowe & Anstaett, L.L.C., of Overland Park, argued the cause, and *Wade A. Dorothy*, of Dorothy & Henoch, L.L.C., of Lenexa, was with her on the briefs for appellants.

*Timothy A. Short*, of Spigarelli, McLane & Short, of Pittsburg, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

NUSS, J.: This is an appeal from an award of benefits by the Workers Compensation Board (Board). Mary Sue Mudd was a nurse at the Neosho Memorial Regional Medical Center (Neosho) who died after suffering a rupture of a cerebral aneurysm (stroke) at work. An administrative law judge (ALJ) denied the claim for benefits filed by her surviving spouse and dependent children. The Board reversed, and Neosho appealed. We granted the motion to transfer from the Court of Appeals under K.S.A. 20-3017.

The parties present three issues on appeal. First, does the record contain substantial competent evidence to support the Board's finding that Mudd's stroke met the "unusual exertion" requirement of the heart amendment of the Workers Compensation Act: K.S.A. 44-501(e)? Second, does "stress" qualify as an external factor which makes the heart amendment irrelevant to Mudd's claim? Third, is the heart amendment unconstitutional?

We hold there is not substantial competent evidence to support the unusual exertion finding, that stress does not qualify as an external factor, and that the heart amendment is constitutional. We therefore reverse.

FACTS

Mudd was a 47-year-old registered nurse employed for more than 10 years by Neosho. She worked in the intensive care unit and the emergency room. While at Neosho, Mudd was called upon

to respond to "code blues," which required her to stop what she was doing and run to help resuscitate a dying patient.

During the 6 months prior to September 13, 1999, 19 code blues had occurred at Neosho. Mudd was involved in responding to seven of them. Her husband, Wayne, testified that she was required to run to code blues and afterward she would be upset, stressed, and unable to sleep, sometimes for days after the event.

On September 13, 1999, Mudd became ill while responding to a code blue and passed out. She was initially treated at Neosho by Dr. Gehrt who performed a spinal tap and found blood in her spinal fluid. Mudd was transferred to Via Christi Regional Medical Center in Wichita. There, Dr. Schwertfeger concluded that she had suffered a cerebrovascular stroke. She died on September 23, 1999.

Dr. Schwertfeger testified that Mudd's stroke was likely the result of a preexisting aneurysm, which is a weakening of a blood vessel wall. According to him, the weak area develops a bulge and eventually ruptures, typically following some sort of exertion or stress which causes an elevation in blood pressure. He stated that running to respond to a code blue would potentially cause an increase in blood pressure and that responding to a code blue was within the normal scope of the duties of an ICU nurse. Dr. Schwertfeger testified regarding his conclusions as follows:

"Q. Do you have an opinion within a reasonable degree of medical certainty, which means more likely than not, whether her activity and stress of running to respond to a code blue precipitated her stroke?

"A. It would be conditions that would be conducive to a subarachnoid hemorrhage in a patient predisposed to that.

. . . .

"Q. So you would say that it is more likely than not that the exertion of this lady running to respond to a code blue was a factor in precipitating her stroke?

"A. It would be a factor I believe, yes."

Mudd's surviving spouse and dependent children sought survivors' benefits under the Workers Compensation Act. The ALJ denied their claim, finding that they had not met their burden of proving an unusual exertion caused her aneurysm to fail. He therefore concluded "[t]hat the claimant was acting within the course

of her 'usual work' and her 'regular employment' when she suffered her cerebrovascular stroke."

After the claimants appealed, the Board reversed and entered an award for them. It found that the exertion from running to respond to a code blue was something that occurred on average only once a month while Mudd was on duty. In addition, the Board found that running was an unusual activity for Mudd and that the running constituted unusual exertion within the meaning of K.S.A. 44-501(e). It further found that she suffered "heightened stress when responding to a code blue," and that "[t]his unusual stress . . . contributed to the unusual level of exertion and, in addition, constituted an external force within the meaning of the heart amendment." Finally, the Board found that the stress, combined with the running, elevated decedent's blood pressure and, more likely than not, precipitated the rupture of the aneurysm while Mudd was responding to the code blue. Neosho and its insurance carrier appealed.

## DISCUSSION

Issue 1: *Does the record contain substantial competent evidence to support the Board's finding that Mudd's stroke met the "unusual exertion" requirement of the heart amendment?*

The Board found that the claim based upon Mudd's stroke was compensable under K.S.A. 44-501. Specifically, the Board found claimants met the requirements of subsection (e), the so-called heart amendment, which states:

"Compensation shall not be paid in case of coronary or coronary artery disease or cerebrovascular injury unless it is shown that the exertion of the work necessary to precipitate the disability was more than the employee's usual work in the course of the employee's regular employment."

The legislature passed this amendment in 1967. L. 1967, ch. 280, sec. 1. Its general purpose was to limit compensability for heart and stroke cases and reverse a long line of Supreme Court decisions in which compensation was awarded even though preexisting heart or vascular conditions may have been a predisposing factor. See *Dial v. C.V. Dome Co.,* 213 Kan. 262, 266-267, 515 P.2d 1046 (1973); *Nichols v. State Highway Commission,* 211 Kan. 919, 923,

508 P.2d 856 (1973). In *Nichols* we noted one legal commentator's opinion that by passing the amendment, perhaps the legislature felt that awards were sometimes allowed where the disability or death should have been regarded as the end result of the natural progress of disease, rather than as arising out of employment. 211 Kan. at 923, citing Kelly, *The Unusual-Exertion Requirement and Employment-Connected Heart Attacks*, 16 Kan. L. Rev. 411, 416 (1968).

Accordingly, claimants since 1967 have borne the burden of proof to demonstrate injuries in this category arose out of something more than the exertion required of their usual work in the course of their regular employment. 211 Kan. at 924. See K.S.A. 44-501(a). Kansas is therefore included in a "substantial minority of jurisdictions" which require a showing that the exertion was in some way unusual. 2 Larson's Workers' Compensation Law § 43.03[1][b] (2002).

In the case at hand, the Board found that the exertion from running to respond to a code blue was something that occurred on average only once a month while Mudd was on duty. In addition, the Board found that running was an unusual activity for Mudd and that the running constituted unusual exertion. Finally, it found that Mudd suffered "heightened stress when responding to a code blue," and that "[t]his unusual stress . . . contributed to the unusual level of exertion." These determinations are questions of fact. See *Suhm v. Volks Homes, Inc.*, 219 Kan. 800, 805, 549 P.2d 944 (1976).

Our review of questions of fact is limited to determining whether they are supported by substantial competent evidence. 219 Kan. at 805. This determination, however, is a question of law. *Griffin v. Dale Willey Pontiac-Cadillac-GMC Truck, Inc.*, 268 Kan. 33, 34-35, 991 P.2d 406 (1999). In workers compensation cases, substantial evidence is evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing a substantiating basis of fact from which the issue tendered can be reasonably resolved. We view the evidence in the light most favorable to the prevailing

party and do not reweigh the evidence or determine the credibility of the witnesses. 268 Kan. at 34.

Despite this deferential standard of review, we hold as a matter of law that the record does not contain substantial competent evidence to support several of the Board's key findings: that running was an unusual activity for Mudd, that the running constituted unusual exertion, that Mudd suffered "heightened" stress when responding to a code blue, and that this "unusual stress" contributed to the unusual level of exertion. As mentioned, the law requires the claimant to show " 'that the exertion of the work necessary to precipitate the disability was *more than the [employee's] usual work* in the course of [the employee's] regular employment.' " (Emphasis added.) 211 Kan. at 923. Consequently, the standard for determining what is usual exertion is the work history of the individual involved. *Chapman v. Wilkenson Co.,* 222 Kan. 722, 726, 567 P.2d 888 (1977).

The record is devoid of any evidence, however, of Nurse Mudd's work history which would demonstrate her usual work or the level of exertion required to perform these usual duties. The record simply reveals that on the day in question, for the seventh time in 6 months she ran an unknown distance to a code blue, that she had previously found this activity stressful, and that the running and stress contributed to her stroke. Without a baseline of what is usual for her, there can be no determination of what is *unusual* for her, particularly when "[u]nusualness may be a matter of degree and may appear in the duration, strenuousness, distance or other circumstances involved in the work." 222 Kan. at 728, citing 1A Larson, The Law of Workmen's Compensation § 38.64(a) (1973).

Claimants simply failed to meet their burden of proof as defined in K.S.A. 44-508(g): "to persuade the trier of facts by a preponderance of the credible evidence that such party's position on an issue is more probably true than not true on the basis of the whole record." Likewise, in *Calvert v. Darby Corporation,* 207 Kan. 198, 201, 483 P.2d 491 (1971), we held that "claimant did not sustain the burden of proof that the decedent did anything more than the usual amount of work in the course of his regular employment on the day he suffered his fatal heart attack." Similarly, in *Suhm,* 219

Kan. at 806-07, we observed that after claimant described his usual workday, he admitted that he was no stranger to long work days, road trips, or daily work-related stress. Accordingly, we upheld the district court's conclusion that his exertion on the day in question was no more than that required of his usual work. See also *Woods v. Peerless Plastics, Inc.,* 220 Kan. 786, 788, 556 P.2d 455 (1976) ("We examine first the question of Mr. Woods' usual work which he performed as part of his regular employment.").

Additionally, even if claimants had established through Mudd's work history the requisite baseline for her work and exertion, we question whether they would have been able to meet their burden of proof to establish that the code blue and its accompanying stress on September 13, 1999, sufficiently exceeded this baseline to qualify as unusual. For example, Mudd's own physician, Dr. Schwertfeger, testified that responding to a code blue was within the normal scope of the duties of an ICU nurse, *i.e.,* part of Mudd's usual job. Moreover, since K.S.A. 44-501(e) does not require a certain task to be done daily for it to fit the definition of "usual work," Mudd's husband's testimony that she was required to run to code blues, coupled with the stipulation that she had responded to seven code blues during the 6 months before her stroke, strongly suggests this activity was not unusual.

Issue 2: *Does "stress" qualify as an external factor which makes the heart amendment irrelevant to claimants' claim?*

Six years after the legislature's passage of the heart amendment, we held it did not apply unless the exertion of the work was the precipitating cause of the disability. *Dial v. C.V. Dome Co.,* 213 Kan. 262. We ruled that when exertion was not an issue, the stroke/heart attack claimant could prevail by instead showing an "external force" was the precipitating cause of her disability. See *Dial,* 213 Kan. at 266; *Woods,* 220 Kan. at 788. In this case, the Board found that Mudd's heightened/unusual stress in running to the code blue constituted an external force.

Whether an external force or agency produced a worker's disability is a question of fact. *Suhm,* 219 Kan. 800, Syl. ¶ 4 . Whether stress qualifies as an external force, however, is an issue of first

impression necessarily involving an interpretation and application of the law. See *Kindel v. Ferco Rental, Inc.,* 258 Kan. 272, 277, 899 P.2d 1058 (1995). See *Kuhn v. Sandoz Pharmaceuticals Corp.,* 270 Kan. 443, 456, 14 P.3d 1170 (2000). Our review of questions of law is unlimited. *Lindsey v. Miami County National Bank,* 267 Kan. 685, 689-90, 984 P.2d 719 (1999).

We begin our analysis by identifying the required elements for external force described in *Makalous v. Kansas State Highway Commission,* 222 Kan. 477, 484-85, 565 P.2d 254 (1977):

"To support a finding that claimant's cardiac or vascular injury is the product of some extreme external force, [1] the presence of a substantial external force in the working environment must be established and [2] there must be expert medical testimony that the external force was a substantial causative factor in producing the injury and resulting disability."

In the case at hand, Dr. Schwertfeger's testimony establishes the element of causation: "[H]er activity and stress of running to respond to a code blue . . . would be conditions that would be conducive to a subarachnoid hemorrhage." His testimony, though contradicted by defendants' physician, Dr. Pfuetze, was found more persuasive by the Board and is therefore binding on this court since we do not reweigh evidence or determine credibility of witnesses. *Griffin,* 268 Kan. at 34.

For the Board's determination of the other element, the presence of an external force, it relied upon two cases. It first observed, "[i]n dicta, the Kansas Supreme Court in *Dial v. C.V. Dome Co.,* 213 Kan. 262, 515 P.2d 1046 (1973), indicated that anxiety and stress could constitute external force and an exception to the heart amendment contained in K.S.A. 44-501." Second, the Board noted our finding 3 years later in *Suhm v. Volks Homes, Inc.,* 219 Kan. 800, that the medical testimony failed to establish stress was the external force which precipitated claimant's heart attack and also noted that we had not expressly rejected stress as an external force. The Board therefore concluded *Suhm* implied that stress could constitute external force.

In addition to our examining *Suhm's* implications and *Dial's* acknowledged dicta, however, we must also look to other Kansas law for guidance. The bedrock of our examination is our oft-stated

acknowledgment of the legislative purpose of the 1967 heart amendment: to limit compensability for heart and stroke cases and reverse a long line of decisions in which compensation was awarded even though preexisting heart or vascular conditions may have been a predisposing factor. See *Makalous v. Kansas State Highway Commission,* 222 Kan. at 481; *Suhm,* 219 Kan. at 804-05; *Dial,* 213 Kan. at 266; *Nichols v. Kansas State Highway,* 211 Kan. at 923.

Our examination continues with a recognition of similarly limiting legislative action taken in 1987: the addition of subsection "g" to K.S.A. 44-501. L. 1987, ch. 187, sec. 1. It states in relevant part: "The provisions of the workers compensation act shall be applied impartially to both employers and employees in cases arising hereunder." The addition changed the course of case law which had required courts to tilt somewhat in favor of the employee: to "liberally construe the workers compensation statutes to award compensation to the worker where it was reasonably possible to do so." *Nguyen v. IBP, Inc.,* 266 Kan. 580, 582, 972 P.2d 747 (1999). See *Miner v. M. Bruenger & Co.,* 17 Kan. App. 2d 185, 193-94, 836 P.2d 19 (1992). Just as we are required to give effect to the intention of the legislature as expressed and not determine what the law should or should not be when we review a statute that is plain and unambiguous, so are we prohibited from developing case law inconsistent with the legislature's purpose. See *In re Marriage of Killman,* 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

Our continuing review reveals not only the acknowledged dicta in *Dial* relied upon by the Board, but also our additional statements made there, *e.g.,* an external force is "wholly independent of the workman's exertion." 213 Kan. at 266. As a result, "[w]here the disability is the product of some external force or agency, and *not of the exertion of the claimant's work,* the heart amendment has no applicability." (Emphasis added.) 213 Kan. at 268. Three years later we confirmed these statements with our analysis of *Dial* in *Woods v. Peerless Plastics, Inc.,* 220 Kan. at 790. "In *Dial* the heat was an external force, wholly independent of the workman's exertion." Similarly, 1 year later we again described our analysis in *Dial* by stating in *Makalous,* 222 Kan. at 483: "[T]he exertion of

the work had little if any appreciable effect in producing the heatstroke in *Dial*."

Consistent with these prior conclusions and reaffirmations, to date we have decided that only "oppressive heat" and "freezing cold and windy weather" qualify as external forces, *i.e.*, external to the claimant's work exertion. See *Dial; Makalous*. Moreover, the example cited by the *Dial* court is similarly external to the workers' exertion: After a worker is confronted by an armed assailant bent on robbery, he suffers a heart attack because of the natural fear and anxiety. 213 Kan. at 267-68. The *Dial* court also discussed another example where a falling beam struck the claimant on the head and caused a cerebrovascular injury; we held the heart amendment would not apply there because "the agency which 'precipitated' the disability was not the exertion of his work but the external force of the blow." 213 Kan. at 267.

In the case at hand, Mudd's own physician testified that the stress was not external to her exertion, but actually combined with it. We therefore hold that stress cannot, as a matter of law, be an external factor under these facts. Any suggestion or implication to the contrary in our prior decisions is overruled. To hold otherwise would be to eviscerate the heart amendment. For example, a stroke or heart attack claimant who has unsuccessfully tried to prove the statutory requirement of unusual exertion could nevertheless prevail by instead showing the cause of the injury was merely the usual (though "substantial" per *Makalous*) stress of her work at the time.

While stress does not qualify under these circumstances as an external factor, claimants are not totally without recourse. They may still demonstrate that the stress was caused by factors external to Mudd's exertion, *e.g.*, the armed assailant or the falling beam in *Dial*'s examples. In addition, they may still show unusual work or unusual exertion which was a causative factor of the unusual stress. Similarly, although not emphasized by the parties as a separate basis for compensation, the Board found that Mudd suffered heightened/unusual stress while responding to the code blue and that it contributed to her unusual level of exertion. We hold, however, that this Board finding of "unusual stress" is not supported by substantial competent evidence. As mentioned earlier regarding

the absence of a baseline to establish unusual work/exertion, the record is also devoid of any baseline to establish that the stress on the day of the stroke was "unusual," *i.e.*, more than what Mudd experienced at other times. For this additional reason, the claim should be denied.

Issue 3: *Is the heart amendment unconstitutional?*

Finally, claimants argue the heart amendment violates the Equal Protection Clause of the United States Constitution. Although this issue was not decided below, the parties agree it was properly preserved and that the rational basis test is the appropriate standard.

As the party asserting a statute's unconstitutionality, claimants' burden is a "weighty one." *Barrett v. U.S.D. No. 259*, 272 Kan. 250, 255, 32 P.3d 1156 (2001). "This is as it should be for the enacted statute is adopted through the legislative process ultimately expressing the will of the electorate in a democratic society." 272 Kan. at 255. Consequently, while the determination of whether a statute violates the constitution is a question of law over which we have unlimited de novo review, we have often held:

" 'A statute is presumed constitutional, and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down. [Citations omitted.]. "This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute." *State v. Durrant*, 244 Kan. 522, 534, 769 P.2d 1174, *cert. denied* 492 U.S. 923 (1989).' [Citation omitted.]" *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 844, 942 P.2d 591 (1997).

Claimants argue the heart amendment violates the Equal Protection Clause because it discriminates between workers. According to claimants, a worker who suffers a heart attack or stroke caused by the exertion of a particular task which that worker regularly performs will be denied any medical or disability compensation, while another worker who suffers an identical heart attack or stroke caused by the same level of exertion performing the exact same task will be awarded full compensation merely because the other worker rarely performed the particular task.

We affirm that the concept of equal protection of the law is one which " 'emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable.' " *Barrett*, 272 Kan. at 256. However, under the rational basis test, "a law is constitutional, despite some unequal classification of citizens, if the 'classification bears some reasonable relationship to a valid legislative objective.' " *Injured Workers of Kansas*, 262 Kan. at 847 (citing *Farley v. Engelken*, 241 Kan. 663, Syl. ¶ 3, 740 P.2d 1058 [1987]).

For a statute to pass constitutional muster under the rational basis standard, it therefore must meet a two-part test: (1) It must implicate legitimate goals, and (2) the means chosen by the legislature must bear a rational relationship to those goals. *Barrett v. U.S.D. 259*, 272 Kan. at 256 (citing *State v. Mueller*, 271 Kan. 897, Syl. ¶ 8, 27 P.3d 884 [2001]). We have previously described it as "a very lenient standard" because, among other things,

" '[t]he "reasonable basis" test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the State's legitimate objective. The state legislature is presumed to have acted within its constitutional power even if the statute results in some inequality. Under the reasonable basis test, a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' " *Injured Workers of Kansas*, 262 Kan. at 847.

Accordingly, "[a] [party] asserting the unconstitutionality of a statute under the rational basis standard has the burden to negate every conceivable basis which might support the classification." *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, Syl. ¶ 6, 930 P.2d 1 (1996), *cert. denied* 520 U.S. 1229 (1997).

As we apply the two parts of the rational basis test, we first recognize that in 1911 the Kansas Legislature abolished the employees' common-law right to sue employers for injuries and provided the employees with an adequate substitute remedy for the right abolished—the Workers Compensation Act. 262 Kan. at 855. The Act allowed employees to quickly receive a smaller, set amount of money for injuries received at work, whether they were caused by employer negligence or not. 262 Kan. at 855. The Act's goal was to make a more equitable adjustment of loss under a system which was intended largely to eliminate controversies and litigation and

place the burden of accidental injuries incident to employment upon the industries themselves or rather upon the consumers of the products of such industries. *McRoberts v. Zinc Co.,* 93 Kan. 364, 366-367, 144 Pac. 247 (1914). The legitimacy of this goal was confirmed many years ago when the Act survived a number of constitutional challenges. See *Shade v. Cement Co.,* 93 Kan. 257, 144 Pac. 249 (1914); *Hovis v. Refining Co.,* 95 Kan. 505, 148 Pac. 626 (1915).

To further advance this clear goal the legislature, in enacting the heart amendment, has chosen to distinguish cases of "coronary or coronary artery disease or cerebrovascular injury" from other cases of "personal injury by accident arising out of and in the course of employment." K.S.A. 44-501(a) and (e). For the last 35 years, compensability has been based on whether the injured worker's exertion which precipitates the disability is more than the exertion of the injured worker's usual work. In *Nichols* we acknowledged that the legislature had passed the heart amendment because it was concerned that workers compensation awards were allowed where disability or death were merely the result of the natural progress of disease, rather than arising out of employment. Indeed, the legislature created the heart amendment after we noted in *McIver v. State Highway Commission,* 198 Kan. 678, 683, 426 P.2d 118 (1967), that any change to our 48 years of case law—holding that compensable injuries included aggravation of heart ailments during the exertion of ordinary labor—would have to come from the legislature.

Claimants' challenge to the legislative goal of the heart amendment appears to be based primarily upon our decision in *Stephenson v. Sugar Creek Packing,* 250 Kan. 768, 830 P.2d 41 (1992). In *Stephenson* we ruled that the legislature's distinctions for injured workers, based solely on whether the injury resulted from "repetitive" rather than a "single" trauma, violated the rational basis test because the scheme was simply to further the alleged goal of reducing workers compensation insurance premiums for industry. 250 Kan. 780.

The goal of the heart amendment, by contrast, is legitimate. It is not to deny compensation to claimants who suffer injury on the

job, but rather to avoid requiring the employer to act as an absolute insurer of claimants whose death or disability was merely the result of the natural progress of disease and which coincidentally occurred at the workplace. This specific goal was generally affirmed by the legislature's later addition of subsection "g" to K.S.A. 44-501 to end the compensation tilt in favor of the employee by now requiring impartial application of the Workers Compensation Act to employees and employers alike. While the legislature's demarcation based on "unusual exertion" is not scientifically exact, the rational basis test does not require such precision. *Injured Workers of Kansas,* 262 Kan. at 848 (citing *Peden v. Kansas Dept. of Revenue,* 261 Kan. 239, 258-59, 930 P.2d 1 [1966], *cert. denied* 520 U.S. 1229 [1997]) (The rational basis test does not require mathematical precision in establishing classifications.). We therefore hold that the statute's purpose implicates a legitimate goal and the means chosen by the legislature bear a rational relationship to that goal. K.S.A. 44-501(e) is constitutional.

While not dispositive of the issue, we are additionally persuaded by the recognition that one third of other jurisdictions also require unusual exertions. Moreover, several of them have found similar statutes constitutional, *e.g.,* not violative of equal protection under the rational basis test. *DeSchaaf v. Indus. Com'n of Ariz.,* 141 Ariz. App. 318, 320, 686 P.2d 1288 (1984) (Arizona statute did not violate equal protection when it provided that heart-related or perivascular injury was not a personal injury by accident arising out of and in the course of employment unless " 'some injury, stress or exertion related to the employment was a substantial contributing cause of the heart-related or perivascular injury, illness or death' "); *Claimants in Matter of Kohler v. Indus. Com'n,* 671 P.2d 1002, 1006 (Colo. App. 1983) (The legislature "could have reasonably concluded that because of the inherent difficulty in ascribing the cause of many heart attacks to particular events or circumstances, a claimant, in order to receive benefits, should be required to show the presence of unusual exertion in the performance of his employment duties, and that such exertion is causally related to the heart attack."); *Benoit v. Maco Mfg.,* 633 So. 2d 1301, 1305 (La. App. 1994) (Rational basis existed for statute requiring a

higher burden of proof in heart-related or perivascular injury cases "because heart attacks and strokes are ordinarily the result of natural physiological causes, rather than trauma or particular effort, which is more easily discernible as a work-related injury."); *Cossé v. Orleans Material and Equipment*, 626 So. 2d 440, 442 (La. App. 1993) (The Louisiana statute "satisfies the legitimate state interest of compensating only those employees who suffer heart attacks as a result of factors related to their work.").

We reverse the Board and affirm the decision of the administrative law judge denying the claim for benefits.