(186 P.3d 840)
No. 99,257

Marva Jolene Adee, Deceased, *Appellant,* v. Russell Stover Candies, Inc., and Travelers Indemnity Company of America, *Appellees.*

Opinion filed July 3, 2008. ▪

*Patrick W. Neustrom,* of Neustrom & Associates, P.A., of Salina, for appellant.

*Brenden W. Webb,* of Couch, Pierce, King & Hoffmeister, of Overland Park, for appellees.

Before HILL, P.J., ELLIOTT and PIERRON, JJ.

HILL, J.: This appeal arises from the Workers Compensation Board's rejection of a surviving husband's workers compensation claim made after his wife died of a heart attack while working at the Russell Stover Candies, Inc. (RSC), plant in Abilene. A heart attack is not a compensable injury under Kansas law. But compensation can be awarded if a worker suffered a loss of chance of surviving a heart attack because of the negligence of an employer or coemployee and that loss arose out of the employee's employment. To be compensable, there must be a causal connection between the employment and the loss of chance of survival. Given our standard of review and the facts provided in the record on appeal, we hold the Workers Compensation Board correctly applied the facts to the law and correctly interpreted the law. We affirm.

*On the day of the heart attack, speedy treatment was crucial for survival.*

On February 7, 2006, at approximately 5:44 a.m., Marva Jolene Adee suffered a heart attack while working. At the time, the plant nurse had not yet begun her shift. Belinda J. Alexander, a supervisor, and Anthony Johnson, an employee were the first to reach her. Adee was found on the ground, gasping for air.

Alexander radioed for Alvis Nuttelman, the plant's superintendent; Alexander then left to retrieve a wheelchair and a first aid kit. Johnson stayed and observed Adee. But when Adee went limp and lost control of her bowels and bladder, Johnson believed she had flat lined. Recalling his cardiopulmonary resuscitation (CPR)

training and experience with providing CPR in the Army, Johnson immediately initiated CPR on Adee.

Soon afterwards, Nuttelman arrived. The superintendent had some training on how to use an automated external defibrillator (AED) through his CPR class at the plant. Nuttelman stated that during his CPR class, the CPR trainer spent about 30 minutes on how to use the AED but that this training did not result in AED certification. This CPR class occurred approximately 8 months before Adee's heart attack.

After observing Johnson performing CPR on Adee, Nuttelman went to the reception area and requested the guard call 911. The guard/reception area was located 30 seconds away and housed an AED. Dispatch received the call at 5:45 a.m.

Without retrieving the AED from the guard/reception area, the superintendent returned. By this time, Mona Pohlman, another supervisor, had arrived. Because Pohlman discovered that Johnson was not CPR certified, Pohlman instructed Johnson to cease providing CPR. Pohlman restarted CPR on Adee once she obtained a CPR mask, which took approximately 1 to 2 minutes to retrieve.

We note that what happened during the delay while retrieving the mask is disputed. Johnson testified that there was a gap in time before Pohlman was given a CPR mask to reinitiate CPR. Pohlman testified that she took over for Johnson only after she had retrieved the CPR mask. Nuttelman, however, corroborated Johnson's deposition, stating that Johnson ceased performing CPR while Pohlman retrieved the CPR mask.

Paramedics/emergency medical technicians (EMTs) arrived at the plant at 5:51 a.m. At approximately 5:53 a.m., the EMTs began rendering care to Adee. The EMTs found that Adee did not have a pulse and was not breathing. They also noted that CPR was in progress, observing that it was being done properly. Periodically, the EMTs stopped CPR to check the pulse, but since a pulse was not ultimately found, the EMTs utilized their AED and administered the first shock at 5:55 a.m.

They transported Adee to the hospital where she regained a pulse and blood pressure. But Adee continued to be unresponsive. Because it was unlikely that Adee would regain meaningful neu-

rological function, Adee's life support was discontinued. She died on February 10, 2006.

*Certain Russell Stover policies are pertinent.*

At the Abilene plant, RSC employs a plant nurse or EMT who is available during the morning and afternoon shifts. The morning shift begins at 7:30 a.m. The plant nurse or EMT is responsible for providing first aid and over-the-counter medication, such as acetaminophen, to RSC employees.

RSC also owns an AED that was purchased approximately 6 to 8 months before February 2006. RSC trains its supervisors so that they are certified in CPR and first aid. This policy allows supervisors to respond to incidents, if the plant nurse or EMT is not present, until emergency medical services (EMS) arrive.

*Adee's husband's claim for workers compensation was rejected at both levels.*

Following Adee's death, her husband filed a claim under the Kansas Workers Compensation Act (Act) as a surviving spouse. In his application, he asserted that the accident occurred from a heart attack and failed resuscitation.

The claimant hired Dr. Mark T. Mikinski to assess the timing and survivability of Adee's heart attack. Dr. Mikinski is certified in cardiology by the American Board of Internal Medicine and practices medicine in Salina. After reviewing Adee's medical records, articles concerning sudden cardiac death, and depositions given by Heather Collins (the plant nurse), Nuttelman, and Johnson, Dr. Mikinski presented his assessment.

### Dr. Mikinski's conclusions

In his deposition, Dr. Mikinski confirmed that Adee suffered an acute myocardial infarction, known as a heart attack, which developed into ventricular fibrillation causing her to lose a pulse. He testified:

"That is what would commonly be known as a heart attack, and specifically, that's when a coronary artery, which is the oxygen fuel supply to the heart, becomes occluded or critically narrowed. The middle or the circumflex artery, the mid portion, was the vessel specifically on the surface of the heart that occluded,

and then ventricular fibrillation is a chaotic activity, electrical activity of the left ventricle, which is not efficient and able to maintain the pumping of blood to the brain and other organs."

From these conditions, Dr. Mikinski stated that the following prognostic indicators can result in an improvement of survival:

- Was the age less than 73?
- Did the event, the rhythm disturbance, occur outside the home?
- Was the event witnessed?
- *Was bystander CPR initiated?*
- Was there rapid activation of EMS in less than 8 minutes?
- *Was there the use of a defibrillator, specifically an AED?*

Dr. Mikinski also indicated that survival is time dependent. "From times zero to five minutes, you go from 100 percent survivable to *five percent survivable at five minutes.* The optimal survival achieved is 74 percent if a person has been shocked in under three minutes." (Emphasis added.)

We note Dr. Mikinski based the 74 percent survival figure from his review of casino studies:

"[I]n casinos, the CPR is delivered by the security guards and they place the defibrillator pads on, they have the AED's readily accessible, and the average time for them is about 3.3 minutes to four minutes for the first shock, and they have a 74 percent survival. And they have a 49 percent survival with shocks greater than three minutes, so that would be—that's clearly achievable, and that's with, basically, CPR training and AED training."

Dr. Mikinski, however, noted that the casino study included all patients, not just those with ventricular fibrillation. Dr. Mikinski further indicated that patients who do not have ventricular fibrillation have a more survivable rhythm.

In Adee's situation, Dr. Mikinski concluded "the two issues that could have optimized the outcome would have been continuous CPR and the use of the AED." The doctor suggested that Adee had all six prognostic indicators favoring survival. "However, the use of bystander CPR was interrupted after approximately 30 to 40 seconds, and the AED was never mobilized and utilized, so essentially, the failure of bystander CPR and [no] use [of] the AED

negated the favorable risk factor of having a witnessed arrest with rapid activation of CPR." Dr. Mikinski further ascertained that the employees could have used the AED within the 3 minutes. He testified:

"[I]n this particular situation, there was the ability to shock [Adee] in really a minute and a half, because the patient went down at . . . 5:44, . . . EMS was notified at 5:45, an AED was present in the location from which EMS was notified, which [was] the guard station, which was then 30 seconds back to the location of the patient. So a shock could have been delivered in two to three minutes, based on that time line."

Regarding the probability rate of Adee's survivability from these issues, Dr. Mikinski estimated that the 2-minute delay before Pohlman reinitiated CPR lessened the survivability from approximately 75 percent to 5 percent. Nonetheless, Dr. Mikinski also conceded that even with continued use of CPR, without the use of an AED within 5 minutes (the EMTs arrived after 5 minutes), Adee's survivability would still have been 5 percent. He further testified:

"Q. [Counsel Neustrom:] I'm not sure you answered my question.

"If she had adequate CPR until EMT's arrived, except for maybe 30 seconds, and there was no AED device used, which we know, then is she in that 10 percent range you talked about?

"A. She's in 5 percent—CPR alone only optimizes your outcome. If you can optimize all the other factors, which include the AED—

"Q. Within five minutes?

"A.—within five minutes, so at five minutes it's 5 percent, and—

"Q. We got there.

"A. And the use of CPR would not have changed that, necessarily.

. . . .

"Q. [Counsel Webb:] Even if he had performed CPR, or he or someone there performed CPR, based on the response time from the EMT's, still would have been less than 5 percent, correct?

"A. At eight minutes, it's still less than 5 percent.

. . . .

"Q. [Counsel Neustrom:] If she would have been shocked back within three minutes and the EMT's arrive at eight minutes, she would have had—

"A. 74 percent survival."

Thus, in order to reach the 74 percent survival rate, Dr. Mikinski stated that the employees would have had to use the AED within 3 minutes.

### Administrative Law Judge's holding

On May 7, 2007, the administrative law judge (ALJ) issued his findings. The ALJ first examined *Scott v. Wolf Creek Nuclear Operating Corp.*, 23 Kan. App. 2d 156, 928 P.2d 109 (1996), but decided it was unclear.

"It is therefore unclear whether under *Scott* the standard for imposing liability rests upon the theory that the conditions of employment put a worker at increased risk, or whether liability is premised upon a worsening of the employee's medical condition as a result of the attempt at medical treatment."

Notwithstanding, the ALJ believed that *Scott* required a showing " 'that the treatment breached a duty or violated a standard of care required.' " Under the emergency doctrine, the ALJ determined that RSC had an affirmative duty to provide medical aid " 'adequate under the circumstances.' " The ALJ further indicated that whether the actions were " 'adequate under the circumstances' " varies with each case.

In this instance, because the gap in the performance of CPR had no impact on Adee's chance of survival according to Dr. Mikinski's testimony, the ALJ held that the only negligence possible in this case was the failure to employ the AED. The ALJ, however, noted that the supervisors were not questioned during their depositions why they did not employ the AED. Furthermore, the ALJ stated that the claimant did not introduce any evidence to establish that any of the RSC supervisors had completed an appropriate training program that would certify them as being qualified to use the AED. Consequently, the ALJ held that RSC's emergency care was " 'adequate under the circumstances' " and, thus, RSC was not liable under the Act.

### Rejection by the Board

On August 30, 2007, the Board affirmed the ALJ. The Board determined that *Scott* considered the negligence of coemployees to be the significant factor. The Board then distinguished this case from *Scott*, stating that "unlike *Scott*, the co-employees, rather than being trained medical personnel were co-workers with minimal CPR and AED training." The Board then concluded that the RSC

employees' actions and inactions did not constitute negligence: "Unlike in *Scott*, none of these co-workers' jobs were to provide emergency medical care or treatment" and that "[t]hese employees were merely caught up in a 'sudden emergency.'"

*Reviewing some law is helpful here.*

The claimant admits Adee's heart attack was not work related. Instead, he bases his claim on the ground that the loss of chance of survival Adee suffered due to RSC and its supervisors' negligent treatment constitutes a compensable injury under the Act. He relies on *Scott* for authority.

Because the claimant agrees with the Board's undisputed findings of fact, this court looks to the application of the facts as its standard of review. Said another way, when the facts in a workers compensation case are not in dispute, the question is whether the Board correctly applied those facts to the law, which an appellate court reviews de novo. *Martinez v. Excel Corp.*, 32 Kan. App. 2d 139, 142, 79 P.3d 230 (2003). Of course, whether an injury is compensable is a question of law over which an appellate court exercises unlimited review. *Coleman v. Swift-Eckrich*, 281 Kan. 381, 383, 130 P.3d 111 (2006).

This court recognizes that both parties agree that Adee's non-work-related heart attack is not a compensable injury under the Act. Our statute, K.S.A. 2007 Supp. 44-501(e), also known as the heart amendment, states: "Compensation shall not be paid in case of coronary or coronary artery disease or cerebrovascular injury unless it is shown that the exertion of the work necessary to precipitate the disability was more than the employee's usual work in the course of the employee's regular employment." See *Mudd v. Neosho Memorial Regional Med. Center*, 275 Kan. 187, 190, 62 P.3d 236 (2003).

The key to this case is the holding in *Scott,* where this court said the heart amendment does not prohibit an employee's injury from being compensated *if he or she claims to have suffered a loss of chance of surviving a heart attack* due to an employer's or coemployee's negligence, *provided that the negligent treatment arose out of the employee's employment.* 23 Kan. App. 2d 156, Syl. ¶¶

3, 4, 5. The phrase, to arise "out of" employment requires some causal connection between the accidental injury and the employment. See 23 Kan. App. 2d 156, Syl. ¶ 4. The court in *Scott* established such a causal connection:

"Where an employee is negligently treated for a nonwork-related injury by an employer or coemployee whose job is to provide medical treatment to employees, there is a sufficient causal connection to make any aggravation of the injury or additional injury arising from that treatment compensable under the Workers Compensation Act." 23 Kan. App. 2d 156, Syl. ¶ 5.

A review of the facts in *Scott* is necessary. Scott suffered a heart attack while working at Wolf Creek Nuclear Power Plant. He died a short time later. Before his death, Scott was treated by Wolf Creek's physician's assistants. Wolf Creek employed these physician's assistants to provide first aid and other immediate care to its employees for both occupational and nonoccupational illnesses and injuries that arose during the workday.

After his death, Scott's estate and heirs filed a medical malpractice action against Wolf Creek and its medical staff, alleging that Scott lost a chance of surviving the heart attack because of the negligent treatment he received from the Wolf Creek's physician's assistants. The district court granted summary judgment in favor of the defendants on the ground that the plaintiffs' suit was barred by the exclusive remedy provision of the Act. Under the exclusive remedy provision of the Act, if an employee can recover workers compensation for an injury, the employee is barred from bringing a negligence suit for damages against an employer or coemployee. K.S.A. 2007 Supp. 44-501(b); 23 Kan. App. 2d at 158.

This court affirmed the trial court and rejected the plaintiffs' argument that they were entitled to maintain their civil suit because their claim was for a noncompensable injury under the Act. According to *Scott*, the plaintiffs' claim (the lost chance of surviving a heart attack due to negligent treatment) qualified as a compensable injury under the Act *if* the negligent treatment arose out of the Scott's employment. In its analysis of whether the negligent treatment of Scott's heart attack arose out of his employment, *Scott* concluded that there was a causal connection. 23 Kan. App. 2d at 158-60. The *Scott* court held:

"We hold that there is a causal connection between Scott's employment at Wolf Creek and his receiving negligent medical treatment. Even though the treatment was for a nonwork-related injury, Scott received treatment because he was an employee of Wolf Creek. The physician's assistants who treated Scott were employees of Wolf Creek whose purpose was to provide medical treatment to Wolf Creek Employees for both occupational and nonoccupational diseases and injures. In other words, Scott would not have been equally exposed to the risk of negligent medical treatment by Wolf Creek physician's assistants apart from his employment at Wolf Creek. His injury, the loss of chance of survival, might not have occurred had he not been at work and treated by Wolf Creek physician's assistants." 23 Kan. App. 2d at 160.

Since *Scott*, our appellate courts have not encountered a similar factual situation until this case.

Here, the record reveals a policy where if the plant nurse or EMT was unavailable, supervisors were to provide emergency care for employees until trained emergency personnel arrived. We are not convinced that these basic medical duties given to RSC supervisors rise to the level of "an employer or coemployee *whose job is to provide medical treatment to employees*" as contemplated in *Scott*, especially since the coemployees in *Scott* were trained medical personnel.

Nevertheless, "it is the intent of the legislature that the workers compensation act shall be liberally construed for the purpose of bringing employers and employees within the provisions of the act to provide the protections of the workers compensation act to both." K.S.A. 2007 Supp. 44-501(g). Therefore, we review whether the RSC supervisors' cessation in providing CPR to Adee or their failure to use an AED on Adee created a sufficient causal connection to make Adee's loss of chance of surviving a heart attack compensable under the Act.

The facts show that RSC's supervisors were certified in CPR and first aid. They ceased providing CPR for approximately 1 to 2 minutes until a CPR mask was retrieved, and the response time from EMS was greater than 5 minutes. Dr. Mikinski estimated that the 2-minute delay in CPR lessened Adee's survivability to 5 percent. But, as indicated by Dr. Mikinski, *even if CPR had been provided continuously*, CPR alone would only have provided Adee less than a 5 percent survivability because the EMS response time

was greater than 5 minutes. Thus, the gap in providing CPR to Adee, although not recommended, did not lessen Adee's chance of survival.

Because the failure to provide continuous CPR did not affect Adee's chance of survival, Dr. Mikinski stated that the supervisors would have had to use the AED within 3 minutes of Adee's heart attack to improve her survivability to 74 percent. But RSC did not train its supervisors on how to use the AED device. The record shows that the plant nurse stated her previous employment's training on the AED consisted of an 8-hour course "on nothing but defibrillation, the precautions and risks associated, et cetera." Nuttelman, the only supervisor questioned on RSC's AED training, stated that his training consisted of 30 minutes during his CPR class.

The claimant's only offer of proof that the supervisors were otherwise qualified to use the AED was a copy of the American Red Cross' First Aid/CPR/AED Program Participant's Booklet, which he has furnished in the record and cited to in his brief. This booklet points out that a participant receives an adult CPR/AED skills card after the participant is given a lecture (lecture points 11 and 12), standard first aid video, and passes an adult CPR/AED written examination. The record reveals that after completing the CPR class that included some training in AED, Nuttelman stated he obtained certification in only CPR and not in the use of the AED.

The burden of proof is on the claimant to establish the claimant's right to an award of compensation and to prove the various conditions on which the claimant's right depends. In determining whether the claimant has satisfied this burden of proof, the trier of fact shall consider the whole record. K.S.A. 2007 Supp. 44-501(a).

In this matter, Adee's loss of chance of survival depended upon a showing that the supervisors failed to use the AED in accordance with RSC's policy. But, based upon the facts provided in the record on appeal, RSC's training of its supervisors did not specifically include the use of an AED. Thus, the obligation to use an AED did not fall within the supervisors' responsibility of rendering emergency care to RSC's employees when a plant nurse or EMT was

unavailable. Moreover, in broadly construing the Act to find that RSC supervisors' job could have included providing CPR and first aid to RSC employees until EMS arrived, claimant failed to show that their failure in providing continuous CPR to Adee lessened her chance of survival.

The ALJ and Board were correct.

Affirmed.