No. 110,535

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DONALD D. BASE, JR.,
*Appellant*,

v.

RAYTHEON AIRCRAFT COMPANY and
HAWKER BEECHCRAFT CORP.,
*Appellees*.

SYLLABUS BY THE COURT

1.

In a workers compensation case, the decision of the administrative law judge and the Workers Compensation Board to exclude the testimony and report of an independent medical examiner as a sanction for counsel's violation of a no-contact order is reviewed by an appellate court to determine whether the agency action is unreasonable, arbitrary, or capricious.

2.

Under the facts herein, the administrative law judge and the Workers Compensation Board did not act unreasonably, arbitrarily, or capriciously in excluding the report and deposition testimony of two independent medical examiners as a sanction for claimant's counsel's violation of the administrative law judge's no-contact order.

Appeal from Workers Compensation Board. Opinion filed July 3, 2014. Affirmed.

*Scott J. Mann*, of Mann Law Offices, L.L.C., of Hutchinson, for appellant.

*Clifford K. Stubbs* and *Douglas M. Greenwald*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellees.

Before MALONE, C.J., BRUNS, J., and HEBERT, S.J.

MALONE, C.J.: Donald D. Base, Jr., appeals the denial of his workers compensation claim. Base alleged that his lower back was injured in a "series of events, repetitive use, cumulative traumas or microtraumas" as a maintenance worker at Raytheon Aircraft Company (Raytheon). The administrative law judge (ALJ) denied Base's claim for payment of medical expenses he incurred for surgical treatment, finding that he failed to prove that he suffered personal injury in a series of accidents or that his back surgery was causally related to his work duties. Upon review, the Workers Compensation Board (Board) affirmed the ALJ's denial, finding that Base failed to prove that his initial injury arose out of and in the course of his employment or that the aggravation, acceleration, or intensification of his condition stemmed from his job. Base raises two arguments on appeal: (1) the Board erred in excluding Dr. Paul Stein's medical testimony and report in violation of K.S.A. 2013 Supp. 77-621(c)(5); and (2) the Board erred in excluding Dr. John Estivo's medical testimony in violation of K.S.A. 2013 Supp. 77-621(c)(5). For the reasons set forth herein, we affirm the Board's decision.

FACTUAL AND PROCEDURAL BACKGROUND

*Base's workers compensation claim*

Base began working in Raytheon's maintenance department in 1974 at the age of 18. His job duties required him to perform many physical tasks, including moving office furniture, painting, ladder work, and removing 55-gallon drums of scrap material. After 37 years of employment, Base was laid off in March 2012 when Raytheon closed its plant in Salina, Kansas.

In 2004, Base developed low back pain and bilateral leg pain, which was worse on the right side. He rated the pain at 5 or 6 on a scale of 1 to 10. Base sought treatment for

2

his symptoms from his family physician, Dr. Mark Krehbiel, in October 2004. Dr. Krehbiel referred Base to Dr. William D. Kossow. Dr. Kossow ordered an EMG conduction study of Base's lumbar spine, which was performed in October 2004, and an MRI study of Base's lumbar spine, which was performed in November 2004. The latter test revealed a herniated and bulging disc with an annular tear in Base's lower back. Base underwent physical therapy for his back and received chiropractic treatment intermittently beginning in 2004.

In January 2005, Base had a surgical consultation with Dr. Ali Manguoglu. He complained of low back pain radiating down both legs, worse on the right side. Base began receiving periodic epidural steroid injections to treat his back pain; he had five or six injections throughout 2005. Base had a second surgical consultation in late January 2005, this time with Dr. Theo Mellion. Dr. Mellion recommended a posterior interbody fusion and stabilization surgery to treat Base's low back problems. However, Base declined surgery, opting to continue receiving epidural steroid injections and taking pain medication prescribed by Dr. Krehbiel.

Base visited Dr. Krehbiel in August 2005, complaining of low back pain radiating down to his right buttock and right leg. He returned to Dr. Krehbiel in April 2006, this time reporting low back pain that radiated down both legs. Base said he was hardly able to get around or work and described himself as being miserable with pain. He said that he could not sleep, sit, or stand. He walked bent over and with a limp because of the pain present in his low back and bilateral lower extremities. Dr. Krehbiel ordered a second MRI study of Base's lumbar spine. He also recommended that Base seek a second opinion regarding treatment options, but he did not seek a second opinion. Base was back again in May 2006, reporting to Dr. Krehbiel that he had constant charley horse cramps in his buttocks and both legs. After receiving treatment from Dr. Manguoglu and Dr. Krehbiel, Base testified that his back improved in 2006. Throughout this entire period, Base continued working full-time at Raytheon without restrictions.

On January 11, 2007, Base was moving a filing cabinet onto a dolly as part of his maintenance duties when he felt something in his back "snap." He reported the incident to his employer, and an internal medical report was prepared. Following the January 2007 incident, Base testified that his low back symptoms and his pain level increased significantly. Raytheon sent Base to Dr. Pat Do for examination and treatment recommendations. On March 30, 2007, Base met with Dr. Do, complaining of low back pain and bilateral lower extremity pain. Base told Dr. Do about the January 2007 incident with the filing cabinet and his history of low back and bilateral radicular pain dating back to 2004. Base said that his current pain was similar to what he had previously experienced. After conducting a physical examination and a review of Base's medical records, Dr. Do could not identify any change in the physical or anatomical structures of Base's body as a direct result of the January 2007 incident. He diagnosed Base with low back pain and bilateral lower extremity radicular pain, right greater than left. Dr. Do concluded that Base "had just a temporary aggravation of a pre-existing condition." Base continued to take pain medication and sought the same treatment from Dr. Krehbiel he had been receiving prior to January 2007.

Base filed a series of applications for hearing with the Division of Workers Compensation, alleging an injury to his back and "all other portions of the body affected" as a result of repetitive bending, twisting, and lifting during the performance of his job duties. In his initial application of July 20, 2007, Base alleged an accident date on or about January 11, 2007. On July 27, 2007, he amended the accident date to a series through January 17, 2007.

At the February 12, 2008, preliminary hearing, Base requested medical treatment for his lower back as recommended by Dr. Michael H. Munhall. Raytheon acknowledged the singular January 11, 2007, incident involving the filing cabinet, but it denied a series through January 17, 2007. Base testified about his prior history of back pain but said that his condition "got better" during 2006. But he said that after the January 2007 incident,

4

his back pain worsened. Base acknowledged that the treatment he was seeking was the same treatment he had been receiving prior to the January 2007 incident. The ALJ entered an order appointing Dr. Paul Stein as a neutral physician to perform an independent medical examination (IME) of Base. The ALJ asked Dr. Stein to make a diagnosis and recommendations for treatment and address the issues of Base's ability to work, temporary work restrictions, and medical causation—specifically, whether Base's current complaints were causally related to the January 2007 incident or performance of his work duties. The ALJ took Base's request for medical treatment under advisement pending receipt of the IME report from Dr. Stein.

Dr. Stein examined Base on March 12, 2008. Base complained of pain in his lower back around the beltline and below, which radiated predominately into the right lower extremity. Dr. Stein was of the opinion that Base "appear[ed] to have sustained an aggravation of preexisting lumbar degenerative disk [*sic*] disease which has been symptomatic at least as recently as May of 2006 and possibly thereafter." Dr. Stein added that it was difficult to know to what extent Base's January 2007 incident at work represented a true aggravation or acceleration of the underlying pathology. "Assuming the accuracy of Mr. Base's report of the work incident, it would represent at least a temporary aggravation but I do not know if any truly structural change has occurred." Dr. Stein recommended x-rays of Base's lumbar spine and advised that comparison of these new images with Base's prior MRI images from April 2006 would be helpful.

On April 24, 2008, the ALJ authorized Dr. Stein to refer Base for the recommended MRI scan and requested that Dr. Stein thereafter supplement his recommendations for treatment. New MRI and x-ray studies of Base's lumbar spine were performed on May 14, 2008. Dr. Stein compared them with Base's MRI scans from November 15, 2004, and April 18, 2006. He issued a follow-up report, concluding: "I do not see progression of the disk [*sic*] protrusion at L4-L5 or progression of slippage at L5-S1 such as to document a significant recent aggravation of the preexisting pathology. Any

5

recent aggravation should be considered temporary without definitive structural change." Dr. Stein's treatment recommendations included epidural steroid injections and physical therapy with intermittent lumbar traction. On July 1, 2008, the ALJ entered an order finding that Base was entitled to conservative medical care.

On November 25, 2008, Base filed another application for preliminary hearing, again in regard to the series of accidents through January 17, 2007. Attached to the application was a November 24, 2008, letter written by Dr. Kossow. Dr. Kossow wrote that Base had completed a physical therapy program and had two lumbar epidural steroid injections. Dr. Kossow stated that Base had complied with the treatment suggested by the IME physician, but his symptoms had not improved. "His back pain is worse than it was 2 months ago. He continues to have radicular pain into both legs, right worse than left, and the right leg continues to have numbness and tingling." Base's physical examination was unchanged from his previous exams. Dr. Kossow recommended that Base consider surgical intervention and consult a neurosurgeon.

On December 14, 2010, the ALJ filed an order again appointing Dr. Stein to perform an IME of Base. Dr. Stein reexamined Base on January 31, 2011, and prepared a report dated February 11, 2011. He noted that Base complained of greater pain than he had during his prior examination, which he attributed to heavy work activity. Dr. Stein stated that Base's report was "understandable as any individual with a bad back would likely have more pain with heavy activity." However, Dr. Stein noted that multiple MRI scans had not shown evidence of a significant alteration in pathology. "Therefore, there is no evidence of a structural injury to lower back from activity on or after 1/17/07 as compared to before." Dr. Stein recommended conservative management and possible surgical intervention, which were no different than the treatment recommendations prior to January 2007.

Following MRI and x-ray scans of Base's lumbar spine performed in February 2011, Dr. Stein issued another IME report dated March 10, 2011. Dr. Stein stated that the latest diagnostic tests showed certain abnormalities. He concluded:

"This pathology is of longstanding [*sic*]. There is no evidence of structural alteration from work activity. With this type of pathology, especially being symptomatic previously, it is not uncommon that physical activity would increase the pain. This increase in the level of discomfort is not, however, a structural injury or an acceleration of the pathological process. The studies reviewed today do not alter the opinions noted in my report of 1/31/11. . . . [T]he need for surgery subsequent to January of 2007 is no different than it would have been prior to that time."

Based on Dr. Stein's 2011 IME reports, the ALJ entered a March 23, 2011, order denying Base's preliminary hearing request for additional treatment. The ALJ found: "Claimant's current conditions and need for surgery are the products of the natural progression of pre-existing degenerative disc disease, and are not attributable to the lifting incident of January 11, 2007 . . . or work activity performed thereafter . . . ."

From the January 2007 incident through May 5, 2011, Base continued to work for Raytheon in the maintenance department. On May 6, 2011, Base underwent a posterior interbody fusion and stabilization surgery performed by Dr. Mellion. This was the same procedure that Dr. Mellion had recommended in 2005. The surgery was successful, and, after a period of healing, Base returned to full-duty work at Raytheon where he was employed until he was laid off in March 2012. In the time period immediately prior to his surgery, Base rated his pain at a 10 on a scale of 1 to 10. After surgery, Base rated his pain after a full day of work at 1 or 2. Base has been unemployed since being laid off from Raytheon and rated his current back pain at 0.

7

*Base's counsel's violation of the ALJ's no-contact order*

Represented by new counsel, Scott J. Mann, Base filed another application for hearing on April 12, 2012, alleging a series of accidents through May 12, 2011—the date that Base believed he took off work to have surgery. He amended his accident one more time to a series through May 5, 2011, in order to correct that date.

The ALJ's February 12, 2008, and December 14, 2010, orders appointing Dr. Stein as a neutral physician contained explicit language directed to counsel of record regarding communication:

> "Counsel for Respondent is to contact Dr. Stein and arrange an appointment for Claimant's IME and notify Claimant's counsel of date and time. Counsel are to jointly submit all available medical records to Dr. Stein prior to his examination of Claimant. Other than scheduling of Claimant's IME and the conveyance of medical records, there is to be no communication between counsel and Dr. Stein until after receipt of the IME report. If, upon receipt of the IME report, either counsel wishes to consult further with Dr. Stein, approval must first be obtained through a telephone conference call among counsel and the Court."

Nevertheless, Mann wrote a letter to Dr. Stein with a handwritten date of April 13, 2012. The letter provided an extensive review of Base's medical and employment history and then asked Dr. Stein to perform "a standard independent medical evaluation" and address a number of medical issues. Mann noted that he had amended the claimed date of accident from a specific event on January 17, 2007, to a series of injuries from work activities for all dates of his employment up to the day he took off for surgery.

The letter went on to discuss the definition of the term "accident" and added that an accidental injury results under the Kansas Workers Compensation Act (the Act) even where the accident only serves to aggravate a preexisting condition. Mann concluded:

"Thus, the issue is not whether Donald Base's work activities, and/or the single event on January 7, 2007, caused a visible structural change to his low back condition? Rather, please provide your medical opinion as to whether, Donald Base's work activities from January 12, 2007 to May 12, 2012, aggravated, intensified or accelerated his pre-existing lumbar spine condition, rendering the condition increasingly more symptomatic and painful, and ultimately the need for medical treatment, to include surgical intervention?"

Dr. Stein examined Base a third time and submitted a "Reevaluation/IME" dated May 1, 2012. The report lists Mann as the referral source. Under the section "Summary and Conclusions," Dr. Stein made the following assessment regarding Base's claim:

"The referral letter from Mr. Mann for this evaluation indicates that 'accidental injury is compensable under the Kansas Workers Compensation Act even where the accident only serves to aggravate a preexisting condition'. He further indicated that the term 'accident' includes 'a series of event, repetitive use, cumulative trauma or micro traumas' and further states that 'it is not essential that a lesion or (structural) change be of such a character as to present external or visible signs of its existence'. There is evidence in the medical records as well as the nature of the patient's work activity to indicate an aggravation and intensification of his preexisting condition by the work activity on 1/17/07 as well as subsequent activity. I cannot state that there was an acceleration of the degenerative process based upon the imaging studies but it is appropriate to state, within a reasonable degree of medical probability, that the work activity aggravated the lower back condition and increased the intensity of his symptomatology."

On June 11, 2012, Raytheon filed a motion for relief due to violation of court order. Raytheon requested that the court quash and strike the May 1, 2012, report Base obtained from Dr. Stein "in contravention of the Court's prior Orders in this case" and adopt Dr. Stein's prior reports in their entirety without further deposition testimony.

On July 19, 2012, the ALJ conducted a hearing on Raytheon's motion. The ALJ referenced its two previous orders designating Dr. Paul Stein as an IME physician and

9

instructing counsel not to contact the physician without the court's prior approval. Mann acknowledged that he "technically violated" the ALJ's order but countered, "I'm not really sure I consulted with Dr. Stein about this case. I certainly have never met with him or spoke to him about it."

On July 20, 2012, the ALJ ordered that neither Dr. Stein's May 1, 2012, report nor his testimony would be considered by the court. The ALJ found that Mann's violation of the IME orders warranted a response from the court:

> "To allow violation of the court's IME order without imposing any sanction would invite further and future violations and undermines the court's efforts to obtain and rely upon independence [*sic*] medical examinations. Dr. Stein's May 1, 2012 report will not be considered by the court. Dr. Stein's testimony will not be considered by the court. Claimant may consult another expert to replace the excluded opinion of Dr. Stein."

At Base's regular hearing on November 9, 2012, counsel for Raytheon inquired whether Mann would be allowed to introduce Dr. Stein's May 1, 2012, report through any other means. The ALJ stated that if a subsequent medical evaluation were to rely upon Dr. Stein's May 1, 2012, opinion, then the court's order of exclusion would extend to any opinion based upon Mann's improper contact with Dr. Stein.

*The ALJ's award and the Board's order*

On November 9, 2012, the ALJ conducted Base's regular hearing. Base dismissed with prejudice his claim for the accident date of January 11, 2007; the court clarified that it would proceed to consider the alleged injury to Base's low back caused by repetitive bending, twisting, and lifting in an "accident in a series through May 12, 2011." Before Base called his first witness, counsel for Raytheon asked the court to clarify its ruling regarding "fruits of [the] poison[ous] tree" resulting from Base's violation of the no-contact orders regarding Dr. Stein. The ALJ replied that if a subsequent medical

10

evaluation were to rely upon Dr. Stein's May 1, 2012, report, then it also would be excluded.

Base testified on his own behalf. He confirmed that from 2004 to 2011, his back pain waxed and waned but said that the January 2007 filing cabinet incident significantly increased his pain. Base said he did not have back surgery when it was first recommended in 2007 because he "just thought [he] could try and get better again." But his symptoms did not improve after the incident; in fact, his symptoms grew continually worse up until 2011. In May 2011, Base's symptoms were so severe that he decided he had no choice but to proceed with surgery. Dr. Mellion performed a fusion surgery. After 3 months of post-surgery recovery, Base resumed his job in maintenance at Raytheon until the Salina plant shut down. He rated his back pain in May 2011 before his surgery at a 10. After recovering and returning to work, Base rated his back pain at a 1 or 2.

In addition to Base's testimony, the record before the ALJ included Dr. Stein's 2008 and 2011 IME reports, the deposition testimony of Dr. Do, and the deposition testimony of three additional physicians who examined Base and formed opinions regarding whether he sustained a work-related injury to his low back.

Dr. David Ebelke, an orthopedic surgeon who limits his practice to treatment of the spine, conducted a medical records review and physical examination of Base at Raytheon's request. Dr. Ebelke noted in his report that the 2004 and 2006 MRI scans of Base's lumbar spine confirmed central disc herniation at L4-L5, stenosis, and disc herniation at L5-S1 with an annular tear. He testified that stenosis is a condition that never heals or corrects itself; the symptoms can wax and wane, but the condition is still there. Dr. Ebelke said Base had preexisting spondylosis, spondylolisthesis, degenerative disc disease, bulging discs, and spinal stenosis and that these conditions necessitated surgery. Dr. Ebelke stated, "The general expectation, the natural history, if you will, will

11

be for them to be gradually, slowly but surely, get worse over time." This progression can occur with or without heavy work activities.

Dr. Ebelke compared the 2011 MRI scan of Base's lumbar spine with those obtained prior to the January 2007 incident; he saw long-term changes only. He testified that a person like Base, who has a long-term history of symptoms from his degenerative back disease, would be expected to experience an increase in pain while performing physical activities. Dr. Ebelke opined that repetitive activities like bending, stooping, lifting, and twisting did not cause the condition or make it worse. Rather, they may have seemed to make Base's symptoms worse because he was limited by his condition. Dr. Ebelke said that Base did not undergo any anatomical aggravation or physiological change as a result of his decision to keep working. He declined to assign a functional impairment rating for Base's medical condition because his work was not the cause.

Dr. Edward Prostic, an orthopedic surgeon, also examined Base on March 16, 2012, and prepared an IME report at the request of Base's attorney. Dr. Prostic acknowledged that Base suffered from aggravated preexisting spondylolisthesis and degenerative disc disease prior to January 2007 but opined that the January 2007 work incident permanently aggravated those conditions and made Base's May 2011 surgery necessary. He stated that it was likely that repetitive work activities would have aggravated Base's condition.

Dr. John Estivo, an orthopedic surgeon, also examined Base on August 9, 2012, and prepared an IME report at the request of Base's attorney. Base reported to Dr. Estivo that his symptoms worsened because of the January 2007 work incident. Dr. Estivo diagnosed Base with status post L4-L5, L5-S1 fusion and was of the opinion that the January 2007 incident and Base's work activities thereafter aggravated his lumbar spine and increased his lumbar spine and leg pain. Base's attorney provided Dr. Estivo with a copy of his April 13, 2012, letter addressed to Dr. Stein as well as Dr. Stein's excluded

12

May 1, 2012, "Reevaluation/IME" report. Dr. Estivo's report contained an extensive discussion of both documents. He quoted at length from Dr. Stein's report and adopted the opinions expressed therein.

On April 4, 2013, the ALJ filed the award in Base's workers compensation case. In addition to excluding Dr. Stein's May 1, 2012, report and deposition testimony, the ALJ also excluded the deposition testimony of Dr. Estivo from the record:

> "Claimant, although admitting violating the court's no-contact order, and originally agreeing to sanctions, now chooses to further violate the court's no-contact order, as well as the July 19, 2012 order suppressing the revised Stein report. Claimant used Dr. Stein's revised report, as well as the same letter that requested Dr. Stein to invade the province of the court, to persuade Dr. Estivo, and persuade **him** to invade the province of the court. These efforts to 'back-door' Dr. Stein's revised opinions into the record before the court taint the opinions of Dr. Estivo, and render them less persuasive.
>
> "**The court will not consider the causation opinions of Dr. Stein produced by violating the court's no-contact orders, and the court will not consider the causation opinions of Dr. Estivo, which have been tainted by the inappropriate contact with Dr. Stein, and which inappropriately attempt to 'back-door' into evidence Dr. Stein's revised opinions.**"

The ALJ further found that given the nonwork-related character of Base's preexisting degenerative disc disease, its naturally progressive quality, and the absence of any lesion or change in the physical structure of his body attributable to his work duties through May 5, 2011, Base had failed to sustain his burden of proof of having suffered a series of personal injuries. The ALJ also ruled that Base had failed to sustain his burden of proof of suffering a series of accidents or of an impairment of function as a result of an accident or performance of his work duties. An award was entered in favor of Raytheon.

On April 4, 2013, Base filed an application for review by the Board. The Board filed an order on August 27, 2013. First, the Board affirmed the ALJ's exclusion of Dr.

13

Stein's May 1, 2012, report and deposition testimony from the record and of Dr. Estivo's deposition testimony from the record:

> "The 2012 contact with Dr. Stein, without the court's permission, was a direct violation of the ALJ's no-contact provision in the IME referral Order. The later attempt to depose Dr. Stein was, as noted by the ALJ, a 'back-door' attempt to place the Dr. Stein medical report of May 1, 2012, into evidence. Finally, the attempt to introduce the report through Dr. Estivo was equally tainted and inappropriate."

The Board also affirmed the ALJ's denial of benefits to Base, finding that he failed to prove that he suffered personal injury by an accident arising out of and in the course of his employment or that the aggravation, acceleration, or intensification of his condition stemmed from his job. Base timely filed a petition for judicial review.

DID THE BOARD ERR IN EXCLUDING THE EVIDENCE FROM DR. STEIN AND DR. ESTIVO?

Base contends that the Board erred in excluding from evidence Dr. Stein's deposition testimony and May 1, 2012, report and Dr. Estivo's deposition testimony, in violation of K.S.A. 2013 Supp. 77-621(c)(5). We will address these claims together. Base argues that by affirming the ALJ's "blanket order" precluding him from presenting Dr. Stein's testimony and report and Dr. Estivo's testimony, the Board failed to allow him to be heard and present evidence on his claim. As a result, Base asserts that the Board's order was neither reasonable nor impartial as required by the Act.

Raytheon responds that the Board did not act unreasonably, arbitrarily, or capriciously in excluding Dr. Stein's deposition testimony and report and Dr. Estivo's deposition testimony. Raytheon asserts that the Board properly sanctioned Base's willful violation of the ALJ's orders barring ex parte contact between counsel and the court-appointed neutral examining physician.

14

*Standard of review*

K.S.A. 2013 Supp. 44-556(a) directs that final orders of the Board are subject to review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.*, as amended. This court's review is limited to the grounds in K.S.A. 2013 Supp. 77-621(c). If the issue turns on an interpretation of a statute or another question of law, this court reviews anew without deference to the decision of the Board. *Redd v. Kansas Truck Center*, 291 Kan. 176, 187-88, 239 P.3d 66 (2010); *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010).

K.S.A. 2013 Supp. 77-621(c) defines and limits the scope of this court's review of administrative decisions under the KJRA. The statute states in relevant part:

"(c) The court shall grant relief only if it determines any one or more of the following:

(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

(3) the agency has not decided an issue requiring resolution;

(4) the agency has erroneously interpreted or applied the law;

(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

(8) the agency action is otherwise unreasonable, arbitrary or capricious."

The parties disagree as to which ground for relief listed in K.S.A. 2013 Supp. 77-621(c) applies in the present case. Base argues that the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure. K.S.A. 2013 Supp. 77-621(c)(5). He contends that the Board failed to give him a reasonable opportunity to be heard, failed to allow him to present evidence, and failed to act reasonably without partiality—all requirements of the Act.

Base advocates for a bifurcated standard of review. On disputed issues of fact, he states that an appellate court must view the evidence in the light most favorable to the prevailing party and determine whether there is substantial evidence to support the factual findings of the Board. He asserts that whether there is substantial competent evidence in the record to support the Board's ultimate legal conclusion is a question of law. See *Helms v. Pendergast*, 21 Kan. App. 2d 303, 309-10, 899 P.2d 501 (1995).

Raytheon challenges Base's assertion that this appeal is governed by K.S.A. 2013 Supp. 77-621(c)(5). Raytheon asserts that K.S.A. 44-523(a), in stating that the ALJ and Board shall give the parties reasonable opportunity to be heard and to present evidence, does not impose any specific procedure for addressing violations of orders relating to court-appointed neutral physicians. Rather, Raytheon asserts that the Board's decision to exclude evidence falls under this court's scope of review pursuant to K.S.A. 2013 Supp. 77-621(c)(8)—"the agency action is otherwise unreasonable, arbitrary or capricious."

We agree with Raytheon's characterization of the standard of review. Base is mischaracterizing the ALJ's exclusion of evidence as an evidentiary ruling in order to invoke the broader standard of review corresponding with K.S.A. 2013 Supp. 77-621(c)(5). In fact, the ALJ's decision to exclude the evidence at issue was not based on a determination of its admissibility. Rather, the ALJ sanctioned Base's attorney for his violation of the ALJ's previous no-contact orders. The Board's decision to affirm such a

16

sanction is reviewed under K.S.A. 2013 Supp. 77-621(c)(8)—whether the action was unreasonable, arbitrary, or capricious.

*The Board did not err in excluding the evidence*

Base contends that the Board's exclusion from evidence of Dr. Stein's May 1, 2012, report and deposition testimony and Dr. Estivo's deposition testimony violated the prescribed procedure under the Act. He asserts that the Board failed to allow him to be heard, to allow him to present evidence, and to act reasonably and without partiality. Base concludes that the Board's order should be reversed and his claim should be remanded to the Board with instructions permitting him to present Dr. Stein's evidentiary deposition and for a new adjudication of his claim.

Raytheon responds that it was not unreasonable, arbitrary, or capricious for the Board to affirm the ALJ's order excluding the evidence at issue. It contends that the ALJ's order was fully justified as a sanction for Base's counsel's deliberate violations of no-contact orders relating to the court-appointed neutral physician. Raytheon asserts that the ALJ's decision was narrowly focused to address the specific misconduct in seeking to convert Dr. Stein from a neutral examiner to a retained expert without notice or authorization. Raytheon asks that this court deny Base's request for remand and affirm the Board's decision.

This court was faced with a similar factual scenario in *Johnson v. Topeka Community Healthcare*, No. 108,789, 2013 WL 3331102 (Kan. App. 2013) (unpublished opinion). In that case, the ALJ ordered an independent examination of Johnson by Dr. Pratt. The ALJ ordered limited contacts by counsel with the doctor, stating:

> "Claimant's counsel shall make the appointment for the examination at the physician's
> earliest convenience. Additionally, claimant's counsel shall prepare on non-letterhead

stationary a letter of confirmation of the appointment made, and an itemization of the relevant medical reports and records to be reviewed by the examining physician. Any additional information or requests in the letter must be by agreement of the parties, or by approval of the court. The letter shall be forwarded to the physician after both claimant's counsel and respondent's counsel have affixed their signatures. *Any further contacts, tests, or referrals must be approved by the court. Counsel shall refrain from further contact with the physician without court approval, except to respond to additional information that the physician might request*. (Emphasis added.)" 2013 WL 3331102, at *2.

Johnson complained to the ALJ that on January 3, 2011, "Sheila Wilson-Ufford of Coventry Health Care" contacted Dr. Pratt when she sent him a fax and therapy records regarding Johnson's case. Apparently, Wilson-Ufford held the position of nurse with Coventry Health Care. Johnson argued that this contact was not approved by the ALJ and was in direct violation of the order. Johnson also alleged that Dr. Pratt was contacted by Wilson-Ufford a second time—again without approval and in violation of the ALJ's order—when he issued a rating report to Wilson-Ufford in response to her request. On appeal to the Board, Johnson asserted that Wilson-Ufford's improper contact with Dr. Pratt rendered the ALJ's decision unreasonable, arbitrary, and capricious. The Board rejected Johnson's contention.

On appeal, this court expressed doubt about whether the ALJ's order was actually violated, noting that the order was directed to the counsel of record in the case and did not mention nurses. 2013 WL 3331102, at *2. This court stated that the burden of proving the invalidity of agency action is upon the party asserting invalidity. K.S.A. 2013 Supp. 77-621(a)(1). 2013 WL 3331102, at *3. This court found that Johnson had not explained or demonstrated how she was harmed—or how the appellees were benefitted—by Dr. Pratt's contact with Wilson-Ufford. In fact, Johnson had not even explained who Wilson-Ufford was or how she was connected to the case. 2013 WL 3331102, at *3. Finally, this court noted that when specifically asked whether his opinion was influenced by the fact

18

that a "nurse" from Coventry Health Care requested a rating of Johnson, Dr. Pratt responded "No." 2013 WL 3331102, at *3. This court concluded that Johnson had not shown the Board's decision was unreasonable, arbitrary, or capricious because it considered Dr. Pratt's testimony. 2013 WL 3331102, at *3.

Here, Mann, wrote a four-page letter to Dr. Stein dated April 13, 2012. Mann's ex-parte communication with Dr. Stein is easily distinguishable from the communication at issue in *Johnson*. The ALJ's order in the present case was directed to counsel of record, and it was Base's counsel of record that violated the order, not a third party with an unexplained connection to the case. Raytheon alleged prejudice in its motion for relief due to violation of the court order, explaining that Mann's unauthorized contact "tainted Dr. Stein's objectivity" and would force it to obtain another IME from another physician.

Furthermore, Mann's contact with Dr. Stein clearly influenced Dr. Stein's opinion. Dr. Stein's first two IME's conducted prior to his communication with Mann concluded that Base's claimed injury was a temporary aggravation of a preexisting condition and would result in the denial of any benefits under the Act. However, Dr. Stein's May 1, 2012, report—written at Mann's request—stated that there was evidence to indicate an "aggravation and intensification" of Base's preexisting condition. Dr. Stein assessed a 25% whole body impairment rating.

The ALJ's orders appointing Dr. Stein to conduct IME's contained several important safeguards meant to protect the rights of both parties as well as to ensure that the court received an objective assessment of Base's condition: (1) counsel were to jointly submit all available medical records; (2) there was to be no communication between counsel and the physician until after receipt of the IME report; and (3) after receipt of the IME report, either counsel wishing to consult with the physician would first have to obtain approval in a conference call with the court and opposing counsel. To

19

allow Base to submit into evidence Dr. Stein's report and testimony, obtained in direct violation of the court's previous orders, would be to reward his attorney's bad behavior.

Furthermore, to allow the evidence would prejudice Raytheon, as Dr. Stein's May 1, 2012, "Reevaluation/IME" was solicited by Base's counsel without Raytheon's knowledge, was based upon a medical history prepared solely by Base's counsel, and relied upon legal definitions and issue statements drafted solely by Base's counsel. Dr. Stein's earlier IME reports prepared in compliance with court orders would necessarily have to be reconciled with the additional opinions expressed in the "Reevaluation/IME" improperly solicited by Base.

In marked contrast to the prejudice to Raytheon that would result if the disputed evidence were admitted, Base does not offer any explanation of how its exclusion has actually prejudiced him. Base repeatedly makes the conclusory statement that the Board failed to allow him to be heard, to allow him to present evidence, and to act reasonably and without partiality. However, Base never states how the ALJ's decision to exclude the evidence at issue and the Board's order affirming the ALJ's decision harmed his claim. In fact, when ordering the exclusion of Dr. Stein's May 1, 2012, report and his deposition testimony, the ALJ explicitly stated that Base was free to seek another opinion to develop exactly the same theory and opinion that Dr. Stein expressed so that Base would not be prejudiced. Base sought and received additional evaluations and reports from Dr. Prostic on August 7, 2012, and Dr. Estivo on January 18, 2013. In deposing Dr. Prostic and Dr. Estivo, Base's counsel pursued the same theory—positing that Base's daily work activities caused the aggravation of his preexisting lumbar spine condition—as he did in his letter to Dr. Stein.

Of course, Dr. Estivo's deposition testimony also was ultimately excluded by the ALJ, but again, this exclusion was attributable solely to yet another violation of the court's instructions. Mann provided Dr. Estivo with copies of the letter he wrote to Dr.

20

Stein and Dr. Stein's excluded May 1, 2012, report. Mann did so despite an explicit warning from the ALJ at the start of Base's regular hearing that if a subsequent medical evaluation were to rely upon Dr. Stein's excluded report, then it, too, would be excluded.

Contrary to Base's contentions, the Board did not act unreasonably, arbitrarily, or capriciously in excluding Dr. Stein's May 1, 2012, report and deposition testimony and Dr. Estivo's deposition testimony. The ALJ's order of exclusion did not demonstrate a disregard of the relevant factual and legal circumstances bearing on the determination. Rather, the ALJ acted in an impartial manner with the stated objective of restoring each of the parties to the position they occupied before Base's counsel violated the court's no-contact orders. We conclude the Board did not err in excluding the evidence from Dr. Stein and Dr. Estivo.

Affirmed.