No. 122,471

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PAMELA LARSON, Surviving Spouse of THOMAS LARSON,
*Appellant*,

v.

EXCEL INDUSTRIES, INC.
and
TRUMBULL INSURANCE COMPANY,
*Appellees.*

SYLLABUS BY THE COURT

1.

The heart amendment to the Workers Compensation Act provides that compensation shall not be paid in the case of coronary disease or injury unless it is shown that the exertion of work necessary to precipitate the disability was more than the employee's usual work in the course of the employee's regular employment. K.S.A. 2020 Supp. 44-501(c)(1).

2.

The heart amendment does not create a day-to-day test to measure usual exertion, usual work, or regular employment. What is usual or regular will generally depend upon a number of facts and circumstances, among which the daily activities of the employee may be only one such factor.

3.

The standard for determining what is usual exertion is the work history of the individual involved. Consideration is to be given to the exertion typically required to do the work-related task that resulted in the injury and the exertion required to do the task on

the day of the injury. The exertion need not be a daily requirement for it to fall within the definition of usual work, and a task done only occasionally can be considered usual work.

4.

What is considered usual work is not determined by the job description but by the work actually performed by the employee.

5.

Mootness is a discretionary policy used to avoid unnecessary issues but allows a court to consider an issue when judicial economy would benefit from a decision on the merits. An issue is not moot unless it is clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights. When considering mootness, a court should consider whether an issue (1) is one of statewide interest and of the nature that public policy demands a decision: (2) remains a real controversy; or (3) is capable of repetition.

6.

When exertion is not an issue, a workers compensation claimant may prevail by showing an external force was the precipitating cause of the worker's injury or disability. To show an external force was the precipitating cause of the injury or disability, the presence of a substantial external force in the working environment must be established and there must be expert medical testimony that the external force was a substantial causative factor in producing the injury and resulting disability.

7.

Whether an external force or agency produced the worker's disability is a factual question, but what qualifies as an external force is a legal one.

8.

Whether a worker's coronary disease or injury was caused by unusual exertion or by external forces raises two separate theories of recovery which require different evidence and different elements to be proven but are not necessarily mutually exclusive.

Appeal from Workers Compensation Board. Opinion filed March 12, 2021. Affirmed in part, reversed in part, and remanded with directions.

*Terry J. Torline*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellant.

*Bruce L. Wendel*, of Law Offices of Steven G. Piland, of Overland Park, for appellees.

Before ARNOLD-BURGER, C.J., BRUNS and POWELL, JJ.

POWELL, J.: Thomas Larson suffered a fatal heart attack after returning from an out-of-town business trip in November 2016. His widow, Pamela Larson, sought surviving spouse benefits, but the Kansas Workers Compensation Appeals Board determined she was not entitled to receive benefits due to what is commonly referred to as the heart amendment to the Workers Compensation Act, see K.S.A. 2020 Supp. 44-501(c)(1), because she failed to prove that Thomas' heart attack was caused by exertion beyond that usually required by his job. The Board declined to rule on Pamela's claim that Thomas' heart attack had been caused by external factors, finding all other issues moot.

Pamela now seeks judicial review of the Board's actions, arguing the Board: (1) incorrectly interpreted the heart amendment; (2) erred in finding she presented insufficient evidence to support her claim that Thomas' heart attack was caused by exertion beyond that usually required by his job; and (3) wrongly concluded her claim for benefits on the ground that external forces triggered her husband's heart attack was moot.

After a careful review of the record, we cannot agree with Pamela that the Board misinterpreted the heart amendment and that she presented sufficient evidence to support her claim that Thomas' heart attack was caused by exertion beyond that usually required by his job. However, Pamela's argument that the Board erred in declaring her external forces claim moot has merit because she has alleged sufficient facts which, if true, may support such a claim. Thus, we affirm in part, reverse in part, and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

Thomas, at the time of his death, was 61 years old and employed by Excel Industries, Inc. as a senior quality engineer. According to his job description, Thomas was required to work between 8 a.m. and 5 p.m., but he usually worked from 7:30 a.m. to 4:30 p.m. Thomas' job duties required him to engage in domestic travel to address quality deficiencies impacting production.

In June 2016, Thomas was on a business trip in Chicago, and he took some time to attend a Chicago Cubs game. While at the game, he suffered a heart attack. As a result, Thomas was hospitalized for five weeks in Chicago and underwent surgery for the placement of a stent in his heart.

While in the hospital, Thomas' granddaughter, Amber Larson, visited him. During this visit, Thomas received a call from his boss, Jim Burke. Thomas informed Burke he no longer wanted to travel because he was worried about experiencing another medical emergency. Burke told Thomas he understood and would no longer require Thomas to travel for work. Amber stated Thomas told several family members he would no longer be required to travel for work.

Thomas subsequently returned to Wichita to continue his recovery. As the result of his heart attack, Thomas was prescribed multiple medications to reduce his risk of a

4

sudden heart attack, including Atorvastatin, Clopidogrel, Lisinopril, Metformin, Metoprolol SUCC XL, Viagra, and aspirin—all to be taken daily. Thomas was seen by a cardiologist, Dr. Layne Reusser, in late August. Dr. Reusser cleared Thomas to return to work without restrictions on September 14, 2016.

Upon Thomas' return to work on September 20, 2016, Burke no longer worked at Excel, and Thomas was informed he was still required to travel domestically as part of his job. In November 2016, Thomas was asked to go on a supplier quality review trip to investigate Double H Manufacturing, a potential new supplier located in Rock Valley, Iowa. Thomas added a visit to another supplier to the trip, Clow Stamping, which was located in Merrifield, Minnesota. Pamela and Thomas' daughter, Katrina Dunn, testified Thomas was nervous about the trip.

Thomas' trip was from November 15 to November 17, 2016. Thomas booked the flights, reserved the hotel rooms, and reserved the rental cars. Thomas also scheduled the meeting times with Double H Manufacturing and Clow Stamping. Anani Lawson-Hetcheli, another Excel employee, went on the trip with Thomas. Lawson-Hetcheli and Thomas had gone on business trips together before.

On Tuesday, November 15, the pair worked in the office until noon, took the afternoon off, and left at 5:25 p.m. for a flight from Wichita to St. Louis and then changed planes to fly to Minneapolis. Thomas and Lawson-Hetcheli arrived in Minneapolis at 11:25 p.m. After landing, they took a shuttle to the hotel, arriving around midnight.

The next day, they rented their car from the airport around 8:30 a.m., and Thomas then drove the almost three hours to Clow Stamping in Merrifield for a two-and-a-half-hour tour of the facility. Afterwards, they then drove approximately six hours to Sioux Falls, South Dakota, where they stayed overnight.

On Thursday, November 17, Thomas and Lawson-Hetcheli left the hotel around 6 a.m. and drove to Double H Manufacturing in Rock Valley, an hour away. They were at the plant until 1 p.m., then drove back to the Sioux Falls airport, where they were scheduled to fly out at 5:25 p.m. Their flight was delayed and then canceled because of the weather. Thomas and Lawson-Hetcheli got hotel rooms to spend the night.

Thomas only brought enough prescription medication to last him through November 17. The poor weather continued overnight and into the next morning. Thomas wanted to leave for the airport by 5 a.m., but Lawson-Hetcheli convinced him to wait until 7:30 a.m.

Their flight was originally scheduled to leave Sioux Falls at 12:48 p.m. but was delayed multiple times until the passengers were able to board at 2:44 p.m. The flight landed in Denver where Thomas and Lawson-Hetcheli changed planes and flew to Wichita, landing at 10:15 p.m. Thomas wanted Lawson-Hetcheli to meet Pamela, so they waited by the baggage claim area. Thomas began to have difficulty speaking and trouble breathing, prompting Lawson-Hetcheli to get Thomas a wheelchair and call for help. Another passenger helped Thomas get oxygen and had him lie flat on the ground. EMS arrived, and Thomas was taken to the hospital. Thomas had suffered a second heart attack and died at the hospital the next day.

Pamela applied for surviving spouse benefits on January 23, 2017. Pamela contended that Thomas' death was caused by unusual exertion within the meaning of the heart amendment and, in the alternative, external forces precipitated the heart attack.

Lawson-Hetcheli testified the business trip was typical of their prior trips together and nothing unusual happened on the trip. He also testified that, throughout the trip, Thomas appeared fine and nothing gave him concern for Thomas' health.

6

Pamela retained two medical experts: Dr. John McMaster, a board-certified doctor in emergency medicine, and Dr. Reusser, Thomas' cardiologist. Dr. McMaster believed the long work hours, different job duties, increased stress and anxiety, and the absence of required medication related to the November 2016 trip were significant causative factors triggering Thomas' heart attack on November 18. Dr. McMaster admitted he did not know Thomas' job required out-of-town trips or how often he went on those trips. Dr. McMaster testified Thomas' preexisting conditions of high blood pressure, high cholesterol, and first heart attack could have contributed or triggered his second heart attack.

Dr. Reusser, board certified in cardiology, interventional cardiology, and internal medicine and who treated Thomas after his first heart attack, concurred with Dr. McMaster's diagnosis and agreed with his causation opinions. Dr. Reusser also admitted he was unaware of Thomas' job duties.

Excel retained Dr. Michael Farrar, a board-certified cardiologist, as a medical expert. Dr. Farrar noted Thomas' heart stent had remained open at his death, meaning it was not blocked and not the cause of his death. Dr. Farrar also testified someone who has already suffered a heart attack is at a greater risk for a second one and opined that the business trip factors of long hours, stress and anxiety, and lack of medication were not prevailing factors in the precipitation of Thomas' second heart attack and death. Dr. Farrar concluded the precipitating factors were Thomas' first heart attack, preexisting coronary artery disease, and left ventricular dysfunction. He also testified there was no evidence that missing one day of medication would have caused Thomas' heart attack.

On May 15, 2019, the administrative law judge (ALJ) denied Pamela's claim for benefits. Pamela then appealed to the Workers Compensation Appeals Board, which, on January 23, 2020, also denied her claim, finding the November 2016 trip was part of

7

Thomas' usual work in the course of his regular employment. The Board declared all other issues moot.

Pamela timely seeks judicial review of the Board's actions.

ANALYSIS

Pamela argues the Board erred in three ways: (1) The Board incorrectly interpreted the meaning of the heart amendment; (2) substantial evidence did not support the Board's finding that Thomas was engaged in usual exertion; and (3) the Board erred when it declared Pamela's claim that Thomas' death was caused by external forces as moot.

Appeals from the Board are reviewed under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. See K.S.A. 2020 Supp. 44-556(a); *Base v. Raytheon Aircraft Co.*, 50 Kan. App. 2d 508, 520, 329 P.3d 540 (2014). Pamela bears the burden to prove the Board's actions were invalid. See K.S.A. 77-621(a)(1). The validity of agency action is determined in accordance with the judicial review standards provided in the KJRA. K.S.A. 77-621(a)(2).

I.    DID THE BOARD CORRECTLY INTERPRET THE HEART AMENDMENT?

Pamela first argues the Board incorrectly interpreted the heart amendment to mean an employee cannot recover if the employee is performing his or her usual work in the course of his or her regular employment when he or she suffers a cardiac event. Pamela asserts the correct interpretation of the heart amendment allows an employee to recover when performing his or her usual work if the exertion of the work was more than the employee's usual work.

8

*Standard of Review*

"When interpreting a statute, a court first attempts to discern legislative intent through the statutory language, giving common words their ordinary meanings. *Whaley v. Sharp*, 301 Kan. 192, 196, 343 P.3d 63 (2014). When the language is plain and unambiguous, the court must give effect to its express language, rather than determine what the law should be. The court will not speculate about legislative intent and will not read the statute to add something not readily found in it. *Graham v. Doktor Trucking Group*, 284 Kan. 547, Syl. ¶ 3, 161 P.3d 695 (2007). It is only when the statute's language is unclear or ambiguous that the court employs the canons of statutory construction, consults legislative history, or considers other background information to ascertain its meaning. *Whaley*, 301 Kan. at 196." *Nauheim v. City of Topeka*, 309 Kan. 145, 149-50, 432 P.3d 647 (2019).

When addressing statutes in a workers compensation appeal, we owe no deference to the interpretation or construction of the statute by the ALJ or the Board. *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013).

*Analysis*

To decide Pamela's claim, the Board had to interpret K.S.A. 2020 Supp. 44-501(c), also known as the heart amendment. The heart amendment provides:

"Except as provided in paragraph (2), compensation shall not be paid in case of coronary or coronary artery disease or cerebrovascular injury unless it is shown that the exertion of the work necessary to precipitate the disability was more than the employee's usual work in the course of the employee's regular employment." K.S.A. 2020 Supp. 44-501(c)(1).

The heart amendment does not create a day-to-day test to measure usual exertion, usual work, or regular employment. "[W]hat is 'usual' or 'regular' within the meaning of the

9

[heart] amendment will generally depend upon a number of facts and circumstances, among which the daily activities of a workman may be one, but only one, among many factors." *Nichols v. Kansas State Highway Commission*, 211 Kan. 919, 925, 508 P.2d 856 (1973).

Pamela argues the Board misinterpreted the meaning of the heart amendment because it found an employee cannot recover under the heart amendment when performing the employee's usual work in the course of regular employment when the employee suffers a cardiac event.

The Board's order found Thomas' business trip was part of his usual work in the course of his regular employment. As a result, the Board found Pamela had failed to prove Thomas' heart attack was due to any unusual exertion. While the Board did not go into great detail about the law surrounding the heart amendment, it did discuss the facts of this case in depth. In doing so, it is clear from the record that the Board considered all the relevant factors necessary to decide what was usual and regular in the course of Thomas' employment, as *Nichols* requires. Pamela's assertion that the Board misinterpreted the heart amendment is contradicted by its plain language and by the Board's order, which went through the facts and circumstances of the business trip to determine if it was usual work in the regular course of Thomas' employment. The Board did not misinterpret K.S.A. 2020 Supp. 44-501(c)(1).

II.  DID SUBSTANTIAL EVIDENCE SUPPORT THE BOARD'S FINDING THAT THOMAS WAS ENGAGED IN HIS USUAL WORK?

Next, Pamela argues substantial evidence does not support the Board's finding that Thomas was engaged in his usual work in the course of his regular employment. Specifically, Pamela argues the Board was wrong to conclude out-of-town travel was still a part of Thomas' job in November 2016. Further, Pamela asserts the evidence shows

10

Thomas worked longer hours on the trip than described in his job description. Excel counters that travel was a regular part of Thomas' job duties and the business trip he went on was no different than any of his previous business trips.

*Standard of Review*

A party may challenge an agency's decision on the grounds that it was made on a determination of fact not supported by substantial evidence "when viewed in light of the record as a whole." K.S.A. 77-621(c)(7).

> "'[I]n light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record . . . cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

Our examination of the evidence also requires us to consider whether cross-examination or other evidence has so undermined the evidence supporting the agency's decision that it is insufficient to support the agency's conclusion. *Buchanan v. JM Staffing*, 52 Kan. App. 2d 943, 948, 379 P.3d 428 (2016). "In workers compensation cases, substantial evidence is evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing a substantiating basis of fact from which the issue tendered can be reasonably resolved." *Mudd v. Neosho Memorial Regional Medical Center*, 275 Kan. 187, 191, 62 P.3d 236 (2003).

11

Put perhaps more succinctly, the "in light of the record as a whole" language in K.S.A. 77-621(d) requires (1) a review of the evidence both supporting and contradicting the Board's findings; (2) an examination of the presiding officer's credibility determination, if any; and (3) a review of the agency's explanation as to why the evidence supports its findings. *Redd v. Kansas Truck Center*, 291 Kan. 176, 182-83, 239 P.3d 66 (2010).

*Analysis*

As we have already outlined, the heart amendment limits a worker's ability to receive compensation in a workers compensation case when the injury was the result of a heart attack. It prohibits compensation unless it is shown that the exertion of work necessary to precipitate the heart attack was more than the employee's usual work in the course of the employee's regular employment. K.S.A. 2020 Supp. 44-501(c)(1).

"[T]he standard for determining what is usual exertion is the work history of the individual involved." *Mudd*, 275 Kan. at 192. We are to consider the exertion typically required to do the work-related task that resulted in the injury and the exertion required to do the task on the day of the injury. The exertion need not be a daily requirement for it to fall within the definition of usual work. A task done only occasionally can be considered usual work. See 275 Kan. at 193.

In this case, we must determine whether the November 2016 business trip was Thomas' usual work in the course of his regular employment and whether the exertion of work on the trip was greater than usual.

First, the parties dispute if business trips were still part of Thomas' job duties. Pamela focuses on Thomas' June 2016 conversation with Burke while Thomas was in the hospital recovering from his first heart attack. Thomas' granddaughter stated she was in

12

the hospital room when Burke called, and she placed the call on speakerphone. During the call, she heard Thomas inform Burke he did not want to travel anymore, and Burke told Thomas that was not a problem and not to worry about it anymore. Pamela and Thomas' daughter testified Thomas told them about his conversation with Burke.

However, when Thomas returned to work, Burke no longer worked at Excel, and Thomas was told out-of-town business trips were still a part of his job and he would have to travel as part of his duties. Lawson-Hetcheli confirmed this.

Given this record, sufficient evidence exists to support the Board's finding that out-of-town travel was part of Thomas' job in November 2016. While Burke told Thomas he would not have to travel anymore, there is no evidence his job duties were officially changed. Pamela admitted Excel told Thomas when he returned to work that he would have to travel for work. Thus, the evidence is sufficient for a reasonable person to accept it as supporting the conclusion that out-of-town travel was part of Thomas' job.

Briefly, Pamela also raises the argument that even if out-of-town travel were part of Thomas' job, his job description stated travel would be to address deficiencies impacting production. Pamela argues the November 2016 trip was not part of Thomas' usual work because the purpose of the trip was to tour Clow Stamping and perform a new supplier review of Double H Manufacturing, not to address quality deficiencies impacting production. Pamela also argues that Thomas' acts of booking flights, reserving hotels, and arranging for rental cars were not part of his job description.

What is considered usual work is not determined by the job description but by the work actually performed by the employee. See *Mudd*, 275 Kan. at 192-93; *Nichols*, 211 Kan. at 925. Pamela bears the burden to prove the trip was not usual work. See K.S.A. 77-621(a)(1). Pamela's assertion that Thomas did not make work trips like the November

13

2016 trip is unsupported by the record. Lawson-Hetcheli testified the November 2016 trip was typical of his prior trips with Thomas.

We must also determine if the exertion of the work on the November 2016 trip was more than Thomas' usual work in the course of his regular employment. Pamela's argument here focuses on the hours Thomas worked on the trip. Pamela points to the job description which lists Thomas' usual work hours as being from 8 a.m. to 5 p.m. and that he was not expected to work more than 45 hours in a week. Pamela does the math to show that on the business trip Thomas averaged 14.25 hours a day and worked over 65 hours that week.

The problem with Pamela's argument is that it again relies heavily on Thomas' job description, not the actual work he performed. See *Mudd*, 275 Kan. at 192-93; *Nichols*, 211 Kan. at 925. There is evidence supporting the Board's finding that the November 2016 trip was part of Thomas' usual work. Lawson-Hetcheli testified the trip was typical of the trips they usually took and nothing unusual occurred. In other words, the exertion of the business trip—the long hours, waking up early, getting to bed late, and driving—was part of Thomas' usual work in the course of his regular employment.

Informative here is *Mudd*. In *Mudd*, a nurse, employed for over 10 years at the hospital, worked in the intensive care unit and emergency room. "Mudd was called upon to respond to 'code blues,' which required her to stop what she was doing and run to help resuscitate a dying patient." 275 Kan. at 188-89. In the six months before September 13, 1999, the hospital had 19 code blues and Mudd had responded to 7 of them. Her husband testified she was required to run to the code blues and afterward would be upset, stressed, and unable to sleep. On September 13, 1999, Mudd passed out while responding to a code blue. A doctor determined she had suffered a cerebrovascular stroke, and she died 10 days later. A doctor testified her stroke was likely the result of a preexisting aneurysm, which weakened the blood vessel wall. The weak area develops a bulge and eventually

14

ruptures, typically following exertion or stress. The doctor testified responding to a code blue could cause the increase in blood pressure and responding to a code blue was within the normal duties of an ICU nurse. The Kansas Supreme Court found the record lacked evidence about the nurse's usual work or level of exertion required to perform her usual duties. Without a baseline of what was usual, the court held it could not determine what was unusual. 275 Kan. at 193.

Here, Thomas' wife and daughter testified that the November 2016 trip caused Thomas a great amount of stress and worry. Pamela's medical experts testified the increased stress from the trip likely caused his fatal heart attack. Pamela also relies on Excel's medical expert who testified that the extensive travel, stresses, and missed medication caused stress that did not arise from Thomas' normal job duties. But Pamela's description of Dr. Farrar's deposition leaves out a key detail: Pamela's attorney asked Dr. Farrar to assume travel was not part of Thomas' usual work and Thomas just worked 8 to 5 at a desk. That scenario does not accurately reflect Thomas' usual work as some evidence does exist proving the November 2016 trip was part of Thomas' usual duties. Admittedly, no specific evidence was presented by either party on Thomas' other out-of-town trips for comparison or how often he traveled, but we conclude that Lawson-Hetcheli's testimony constitutes sufficient evidence such that a reasonable person could find the November 2016 trip was usual work in the regular course of Thomas' employment. Sufficient evidence supports the Board's finding.

III.    DID THE BOARD ERR WHEN IT FOUND PAMELA'S EXTERNAL FORCES ARGUMENT MOOT?

Finally, Pamela argues the Board erred when it dismissed all other issues as moot. In addition to claiming that Thomas' heart attack was caused by exertion beyond his usual work, Pamela's alternative theory was that Thomas' heart attack was triggered by an external force or agency. Pamela argues the Board should have addressed this argument

15

on the merits because, if true, the heart amendment would not apply and she is entitled to benefits. Excel does not address mootness but instead argues emotional stress can never be an external factor.

*Standard of Review*

Whether an external force or agency produced the worker's disability is a factual question. What qualifies as an external force is a legal question subject to de novo review. *Mudd*, 275 Kan. at 193-94.

Here, the Board did not decide whether Thomas' heart attack was caused by external forces, finding the issue moot. The determination of mootness is reviewed "de novo and is predicated on prudential considerations." *State v. Roat*, 311 Kan. 581, 590, 466 P.3d 439 (2020). An issue is not moot unless "it is clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights." *State v. Tracy*, 311 Kan. 605, 608, 466 P.3d 434 (2020); *Roat*, 311 Kan. at 584. Mootness is a discretionary policy used to avoid unnecessary issues but allows a court to consider an issue "when judicial economy would benefit from a decision on the merits." 311 Kan. at 587. When considering mootness, "an appellate court should consider whether an issue: (1) is one of statewide interest and of the nature that public policy demands a decision . . . ; (2) remains a real controversy; or (3) is capable of repetition." *State v. Hollister*, 300 Kan. 458, 467, 329 P.3d 1220 (2014).

*Analysis*

The heart amendment limiting compensation applies only if exertion from work was the precipitating cause of the injury or disability. When exertion is not an issue, the claimant may prevail by showing an "'external force'" was the precipitating cause of the

worker's injury or disability. *Mudd*, 275 Kan. at 193. To show an external force was the precipitating cause of the injury or disability, "'[1] the presence of a substantial external force in the working environment must be established and [2] there must be expert medical testimony that the external force was a substantial causative factor in producing the injury and resulting disability.'" 275 Kan. at 194.

After concluding Pamela's claim for benefits was prohibited by the heart amendment because the November 2016 trip was part of Thomas' usual work in the course of his regular employment, the Board perfunctorily dismissed the rest of Pamela's claims, stating: "All other issues are moot." Moreover, the Board offered no explanation as to why Pamela's external forces argument was moot. Excel supplies us with no explanation either, instead choosing to argue why the claim fails on its merits.

However, the merits of Pamela's alternative claim is not before us because the Board never reached that issue. The only question before us is whether the issue is moot. And our review of the record shows this question falls within *Hollister*'s second option— a live controversy remains.

Pamela's unusual exertion argument and her external forces argument raise two separate theories of recovery which are not necessarily mutually exclusive. In her unusual exertion argument Pamela argues Thomas' exertions causing his heart attack were greater than the usual exertions required to perform his regular job. But in her external forces argument, Pamela argues the heart amendment is inapplicable because she claims an external force applied to cause Thomas' heart attack. These are two separate theories of recovery requiring different evidence and different elements to be proven. Thus, the fact that Pamela failed to prove that Thomas' heart attack was triggered by unusual exertions as part of his job does not necessarily preclude a claim that an external force triggered Thomas' heart attack. Thus, Pamela's alternative claim is not moot and remains

17

unaddressed. The Board has a duty to evaluate Pamela's external force theory of recovery absent an explanation of why it is somehow moot.

Excel sidesteps the mootness issue and argues we should just uphold the Board anyway because Pamela cannot prevail on the merits as stress cannot be considered an external force. Excel's argument is based on a misreading of *Mudd*. In *Mudd*, the Kansas Supreme Court held stress, as a matter of law, could not be an external factor under the facts of the case, but other factors that lead to stress can be external forces. The *Mudd* court recognized there may be some circumstances where the claimant can demonstrate the stress was caused by factors external to the claimant's exertion or show unusual work or unusual exertion was a causative factor of unusual stress. 275 Kan. at 196. Here, Pamela argued Thomas' stress arose from the severe winter weather cancelling his first flight and delaying his makeup flight, as well as the fact that the delay led him to run out of medicine.

We not in a position to determine whether an external factor existed absent the Board's findings because whether an external force was a substantial causative factor in producing Thomas' heart attack is a factual question to be determined by the ALJ and Board, not us. See *Mudd*, 275 Kan. at 193.

We affirm the Board's interpretation of the heart amendment and find sufficient evidence supports the Board's findings that Thomas' November 2016 trip was a part of his usual work in the regular course of his job. But we reverse the Board's finding of mootness and remand the case to the Board for it to consider whether an external force caused Thomas' heart attack.

Affirmed in part, reversed in part, and remanded with directions.

18